Lonzetta DAVIS, in her own behalf and as natural guardian of her daughter, Sabrina Davis; Velma Y. Frier, in her own behalf and as natural guardian of her daughter, Shavonne Frier; Janet Grice, in her own behalf and as natural guardian of her son, Melvin Grice; Doris Pinkney, in her own behalf and as natural guardian of her daughter, Antionette Roberson; and Thais M. Jackson, in her own behalf and as natural guardian of her daughter, Tamika Carr; Bruce-Guadalupe Community School; Harambee Community School; Juanita Virgil Academy; Urban Day School and Woodlands School, Plaintiffs-Respondents-Petitioners,

v.

Herbert J. GROVER, Superintendent of Public Instruction of the State of Wisconsin, Defendant-Cross-Claimant-Defendant-Respondent-Petitioner,

Felmers O. CHANEY, Richard Collins, Mary Ann Braithwaite, Lauri Wynn, Linda Oakes, George Williams, Melanie Moore, Donald A. Feilbach, Wisconsin Association of School District Administrators, Inc. Wisconsin Education Association Council, National Association for the Advancement of Colored People, Milwaukee Branch, Association of Wisconsin School Administrators, Milwaukee Teachers Education Association, Wisconsin Congress of Parents & Teachers, Inc., Milwaukee Administrators and Supervisors Council, Inc. and Wisconsin Federation of Teachers, Intervenors-Petitioners-Appellants-Cross Petitioners,†

†Motion for reconsideration denied.

501

v.

Charles P. SMITH, State Treasurer and Board of School Directors of the City of Milwaukee, Cross-Claimant-Defendant-Respondent.

Supreme Court

*No. 90–1807. Oral argument October 4, 1991.—Decided March 3, 1992.*

(Also reported in 480 N.W.2d 460.)

506

For the plaintiffs-respondents-petitioners there were briefs by *Clint Bolick, Allyson Tucker, Jerald L. Hill, Mark Bredemeier* and *Landmark Legal Foundation Center for Civil Rights,* Washington, D.C. and oral argument by *Mr. Bolick.*

For the defendant-cross-claimant-defendant-respondent-petitioner the cause was argued by *Warren D. Weinstein,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

For the intervenors-petitioners-appellants-cross-petitioners there were briefs by *Robert H. Friebert, Charles D. Clausen, David S. Branch, Caren B. Goldberg, Peter K. Rofes* and *Friebert, Finerty & St. John, S.C.,* Milwaukee and *Bruce Meredith* and *Wisconsin Education Association Council,* of counsel, Madison and oral argument by *Robert H. Friebert, Mr. Clausen, Mr. Rofes* and *Mr. Meredith.*

Amicus curiae brief was filed by *Michael J. Julka, Jill Weber Dean* and *Lathrop & Clark,* Madison for the Wisconsin Association of School Boards, Inc.

Amicus curiae brief was filed by *William H. Lynch,* Madison and *Gretchen Miller,* Milwaukee for The American Civil Liberties Union of Wisconsin Foundation, Inc.

Amicus curiae brief was filed by *Julie K. Underwood,* Madison for Herbert J. Grover and oral argument by *Ms. Underwood.*

Amicus curiae brief was filed by *Steven P. Schneider,* Milwaukee and *William P. Dixon* and *Davis, Miner, Barnhill & Galland,* of counsel, Madison and oral argument by *Senator Gary R. George.*

Amicus curiae brief was filed by *Eva M. Soeka,* Milwaukee and *Robert A. Destro* and *Columbus School of Law,* Washington, D.C. and oral argument by *James Klauser.*

Interested party brief was filed by *Patrick B. McDonnell,* special deputy city attorney and *Grant F. Langley,* city attorney, Milwaukee.

CALLOW, WILLIAM G., J. This is a review under sec. (Rule) 809.62, Stats., of a decision of the court of appeals, *Davis v. Grover,* 159 Wis. 2d 150, 464 N.W.2d 220 (Ct. App. 1990). The court of appeals reversed the decision of the Dane county circuit court, Judge Susan R. Steingass, and found that the Milwaukee Parental Choice Program (MPCP) violated art. IV, sec. 18 of the Wisconsin Constitution.[1] The MPCP is a publicly funded program that permits selected children from low-income families to attend nonsectarian private schools at no cost to the student.

---

[1]Article IV, sec. 18 of the Wisconsin Constitution states:

No private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title.

The scope of our inquiry is strictly confined to the specific issues raised on this review. We pass no judgment on the wisdom or desirability of the MPCP. The propriety of the program is most appropriately addressed by the legislature, not the judiciary.

Three issues are raised in this review. The first issue concerns whether the MPCP is a private or local bill which was enacted in violation of the procedural requirements mandated by art. IV, sec. 18 of the Wisconsin Constitution. We hold that the MPCP is not a private or local bill and, thus, is not subject to the procedural requirements of Wis. Const. art. IV, sec. 18.

The program was and remains politically controversial. As such, it was greatly debated in legislative committee public hearings and by the entire legislature. It is evident the program was not smuggled through the legislature. The purpose of this experimental legislation is to determine if it is possible to improve, through parental choice, the quality of education in Wisconsin for children of low-income families.[2] Logically, the best location

---

[2]Wisconsin is the first state in the nation to experiment with a parental choice program which involves the use of private schools as an alternative to the public school system. The program is an attempt to identify factors which could improve the quality of education. Clearly, the program is not only of statewide importance but national significance as well because education of our citizens knows no boundaries and other states could benefit from the knowledge resulting from this innovative experiment.

The citizens of Wisconsin have a long and proud tradition of striving for excellence and an improved quality of life. Our state flag proudly displays our motto in its statement of "Forward." The forum of education is just one area in which Wisconsin demonstrates its excellence and innovation. The University of Wisconsin System is widely recognized as one of the nation's leading systems of public higher education. Furthermore, Wisconsin was a pioneer in the establishment of vocational and technical

to test the program is in a city such as Milwaukee where the socio-economic disparities and educational problems are particularly great and the potential private educational choices are most abundant.

The second issue concerns whether the MPCP violates art. X, sec. 3 of the Wisconsin Constitution, which requires the establishment of uniform school districts. We hold that the MPCP does not violate art. X, sec. 3 of the Wisconsin Constitution because the participating private schools do not constitute "district schools," even though they receive some public monies to educate students participating in the program.

The third issue concerns whether the MPCP violates the public purpose doctrine which requires that public funds be spent only for public purposes. We hold that the MPCP does not violate the public purpose doctrine. We give great weight to legislative determinations of public policy. Sufficient safeguards are included in the program to ensure that participating private schools are under adequate governmental supervision reasonably necessary under the circumstances to attain the public purpose of improving educational quality. Further, the cost of education and the funds available for education are dependent upon the taxpayers' ability to fund an intensive public educational program. The amount of money allocated under this program to participating private schools for the education of a participating student is less than 40 percent of the full cost of educating that same student in the Milwaukee Public School (MPS) system. The total amount of public funds appropriated to fund this experimental program is inconsequential when compared to the total expenditures for public edu-

schools. The MPCP represents another illustration of Wisconsin's innovation and willingness to lead the nation in its attempts to further improve the quality of education and life.

513

cation allocated to schools throughout the state of Wisconsin.

The relevant facts follow. The MPCP, as enacted into law, provides that a kindergarten through twelfth grade (K–12) student who resides in a city of the first class may attend, at no charge to the student, any non-sectarian private school located in the city if the following criteria are met:

(1) the family income does not exceed 175% of the poverty level;

(2) the pupil was enrolled in a public school in the city, was attending a private school under this program, or was not enrolled in school the previous year;

(3) the private school notifies the State Superintendent of its intent to participate in the program by June 30 of the previous school year;

(4) the private school complies with 42 U.S.C. sec. 2000d;[3] and

(5) the private school meets all health and safety laws or codes that apply to public schools.

Section 119.23(2)(a), Stats. Additionally, private schools participating in the program must meet defined performance criteria[4] and submit to financial and performance

---

[3]42 U.S.C. sec. 2000d states:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

[4]Under sec. 119.23(7)(a), Stats., each private school participating in the program must meet at least one of the following standards:

audits by the state.[5] For each participating student, approximately $2,500 in state educational funding is diverted from the Milwaukee Public Schools (MPS) to the participating private school.

The legislature placed significant limitations on the scope of the program. The program limits the number of students that may participate in the program to no more than 1 percent of the school district's membership. Section 119.23(2)(b)1, Stats. This limitation makes the program available to approximately 1,000 Milwaukee students. The record reflects that participating students are selected on a random basis with preference afforded to students continuing in the program and their siblings. This narrowly defined and carefully monitored program provides that no private school may enroll more than 49 percent of its total enrollment under this program. Section 119.23(2)(b)2.

Since the goal of the MPCP legislation is to gather information to assist in identifying educational problems and solutions, a number of reporting and supervisory functions on the part of the State Superintendent as well as the Legislative Audit Bureau are statutorily required by the program. The State Superintendent must submit a report to each house of the legislature concerning achievement, attendance, discipline, and parental

---

1. At least 70% of the pupils in the program advance one grade level each year.

2. The private school's average attendance rate for the pupils in the program is at least 90%.

3. At least 80% of the pupils in the program demonstrate significant academic progress.

4. At least 70% of the families of pupils in the program meet parent involvement criteria established by the private school.

[5] *See* secs. 119.23(7)(b), (8), and (9), Stats.

involvement under the program as compared to the public school system in general. Section 119.23(5)(d), Stats.

The State Superintendent is required to monitor the performance of students participating in the program and is given specific authority to prohibit participation in the program the following school year by any private school which does not meet the performance criteria. Section 119.23(7)(b), Stats.

The State Superintendent is also authorized to conduct one or more financial or performance evaluation audits of the program. Section 119.23(9)(a), Stats. The Legislative Audit Bureau is further required to perform a financial and performance evaluation audit on the program. Section 119.23(9)(b). Clearly, the legislature included very particular and detailed reporting and supervisory requirements to test a new and innovative method of delivering education services to students of low-income families.

Governor Tommy Thompson first proposed a parental choice program in early 1988. The proposal was analyzed by the Legislative Fiscal Bureau, but was never considered by the legislature. In 1989, the governor again proposed a parental choice program, at which time the Legislature requested the Legislative Council to study the proposal.

In October 1989, the bill that led to the enactment of the Milwaukee Parental Choice Program was introduced by a bipartisan coalition of 47 members of the assembly and nine senate co-sponsors. The bill was referred to the Assembly Committee on Urban Education, which held a public hearing on the proposal. A broad array of persons and organizations, encompassing many of the interests represented in this case, appeared at the public hearing. Based on committee reports and the statements made at the public hearing, the commit-

tee recommended an amended version of the bill to the assembly. After considering a number of amendments to the bill, the assembly passed the bill.

The program, as passed by the assembly, was then considered by the senate and referred to the Committee on Educational Financing, Higher Education and Tourism. Subsequently, it was added to the senate budget adjustment bill, a multi-subject bill addressing numerous unrelated topics. The language of this component of the bill was preceded by the title, "Milwaukee Parental Choice Program." Following the addition of a fiscal amendment relating to the program, the entire budget bill was adopted by the senate. The assembly passed the budget bill without again considering the parental choice program.

The governor signed the bill, but vetoed a sunset provision included in the program which would have limited the effective period of the program to a five-year time span. Thereafter, the MPCP was enacted into law under ch. 119, Stats., the chapter applicable to the school system in cities of the first class.

Lonzetta Davis, et al. (Davis), representing families of participating students and private schools participating in the program, initiated this action challenging a number of regulatory actions taken by State Superintendent of Public Instruction Herbert Grover (Superintendent Grover).[6] Davis believed Superintendent Grover's actions were designed to frustrate the MPCP and exceeded his authority as State Superintendent.

Felmers O. Chaney, et al. (Chaney), representing various school administration organizations and the

---

[6]Superintendent Grover attempted to require private schools that wished to participate in the program to execute complex forms certifying that they met numerous requirements in excess of those specified under sec. 118.165, Stats., or in the MPCP.

517

National Association for the Advancement of Colored People, intervened, challenging the MPCP on state constitutional grounds; namely, that it violates Wis. Const. art. IV, sec. 18 (private/local legislation clause), Wis. Const. art. X, sec. 3 (uniform district schools clause), and the public purpose doctrine.

The State of Wisconsin, acting on its own behalf, argues that the MPCP is constitutional in all respects.

The circuit court found the MPCP constitutional and that Superintendent Grover's actions exceeded his regulatory authority. Chaney filed an appeal on the constitutional issues with the court of appeals. Superintendent Grover did not appeal the circuit court's decision on the regulatory issues.

The court of appeals reversed the decision of the circuit court and held that the MPCP violated the private/local legislation clause of Wis. Const. art. IV, sec. 18. It did not reach the uniformity clause and public purpose doctrine issues.

No injunction was ever issued against the Milwaukee Parental Choice Program, which continues to operate unaffected by the pending litigation.

The issues presented in this case involve questions of law. On review, this court decides questions of law independently without deference to the decisions of the trial court and court of appeals. *Ball v. District No. 4, Area Bd.,* 117 Wis. 2d 529, 537, 345 N.W.2d 389 (1984). We now address each of these issues separately.

## I. THE PRIVATE/LOCAL LEGISLATION CLAUSE

Article IV, sec. 18 of the Wisconsin Constitution states:

No private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title.

It was adopted as part of the original Wisconsin Constitution of 1848 and has remained unchanged. In previous cases, we have explained that art. IV, sec. 18 has three underlying purposes:

1) [T]o encourage the legislature to devote its time to the state at large, its primary responsibility; 2) to avoid the specter of favoritism and discrimination, a potential which is inherent in laws of limited applicability; and 3) to alert the public through its elected representatives to the real nature and subject matter of legislation under consideration.

*Milwaukee Brewers v. Department of Health & Social Services,* 130 Wis. 2d 79, 107–08, 387 N.W.2d 254 (1986). The requirements of art. IV, sec. 18 are prescribed to ensure accountability of the legislature to the public and to "guard against the danger of legislation, affecting private or local interests, being smuggled through the legislature." *Milwaukee County v. Isenring,* 109 Wis. 9, 23, 85 N.W. 131 (1901). In *Brookfield v. Milwaukee Sewerage,* 144 Wis. 2d 896, 426 N.W.2d 591 (1988), we further examined legislative accountability. Section 18 also recognizes the need to avoid "internal logrolling"[7] on the part of the legislature. Multi-subject bills by their nature are subject to a greater susceptibility of smuggling and logrolling. They intermingle a variety

[7] "Logrolling" is the legislative practice of embracing in one bill several distinct matters, none of which could singly obtain the assent of the legislature, and then procuring its passage by a combination of the minorities in favor of each of the separate measures into a majority that will adopt them all. Black's Law Dictionary 942 (6th ed. 1990).

of unrelated legislation which singly may not have the support of the majority and, thus, tend to reduce accountability to the public. Nevertheless, the fact that a multi-subject bill contains a program such as the MPCP does not necessarily condemn the process in which the program was enacted as unconstitutional.

The determination of whether a bill violates Wis. Const. art. IV, sec. 18 involves a two-fold analysis. We must first address whether the process in which the bill was enacted deserves a presumption of constitutionality. Second, we must address whether the bill is private or local. If the bill is found to be private or local, then the requirements of art. IV, sec. 18 apply; namely, that the legislation must be a single subject bill and the title of the bill must clearly reflect the subject.

■

The general rule in Wisconsin is that a statute is presumed to be constitutional and "the burden of establishing the unconstitutionality of a statute is on the person attacking it, who must overcome the strong presumption in favor of its validity." *ABC Auto Sales v. Marcus,* 255 Wis. 325, 330, 38 N.W.2d 708 (1949). This presumption of constitutionality was recognized in the art. IV, sec. 18 context in *Soo Line R. Co. v. Transportation Dep't,* 101 Wis. 2d 64, 76, 303 N.W.2d 626 (1981). However, we explained in *Brookfield v. Milwaukee Sewerage,* 144 Wis. 2d 896, 912–13, 426 N.W.2d 591 (1988), that a distinction exists between assessing the constitutionality of the substance of legislation and assessing the constitutionality of the process in which the legislation was enacted. In *Brookfield,* we stated:

> In the sec. 18 context, the point of the rules listed in the text is to determine whether some sham or artifice is being perpetrated by smuggling through a local

bill in the sheep's clothing of a statewide interest or a general bill. . . .

By contrast to sec. 18, under equal protection the legislature is not being accused of violating a constitutionally mandated procedural rule. Therefore, because the legislature is now presumed to have "intelligently participate[d] in considering such bill . . .." (*Isenring,* 109 Wis. at 23) this court is not seeking to determine whether a sham has been perpetrated. Consequently, this court has repeatedly stated that a law attacked on equal protection grounds is entitled to a presumption of constitutionality, *see, e.g., Laufenberg v. Cosmetology Examining Board,* 87 Wis. 2d 175, 181, 274 N.W.2d 618 (1979), which presumption attends the use of the rational basis test.

Thus, although both sec. 18 and equal protection seek to determine whether one group is being accorded favored status, the difference between the sec. 18 and the equal protection contexts is this: In sec. 18 cases, because the legislature is alleged to have violated a law of constitutional stature which mandates the form in which bills must pass, the court will not indulge in a presumption of constitutionality, for to do so would make a mockery of the procedural constitutional requirement . . ..

By contrast, in equal protection, as stated above, the court will presume constitutionality . . . given the quite different purposes of sec. 18 and equal protection.

*Brookfield,* 144 Wis. 2d at 918-19 n.6. In *Brookfield,* there was no indication that the legislature had adequately considered or discussed the legislation in question that was passed as part of the budget bill. The record in the present case is replete with evidence that the MPCP was introduced by a significant number of

legislators and was debated extensively by the legislature and its various committees and agencies. The program was proposed in several consecutive years. The Assembly Committee on Urban Education held a public hearing on the proposed program. The program was passed as a separate, single subject bill by the assembly. Unfortunately, the senate included it as part of the multi-subject budget bill, thereby creating the problem we address here.

We are aware that time constraints sometimes force legislators to pass a variety of worthy legislation in one multi-subject package. However, multi-subject bills reduce accountability to the public and are very susceptible to the charge of violating the procedural requirements of Wis. Const. art. IV, sec. 18. The legislature could avoid litigatory challenges of this nature by using separate, single subject bills for legislation that is not plainly of statewide concern.

However, we find no evidence in this case that suggests the program was smuggled or logrolled through the legislature without the benefit of deliberate legislative consideration.[8] As mentioned earlier, the MPCP legisla-

---

[8]Justice Bablitch's dissenting opinion quite adamantly argues that, "[i]f there were sufficient votes in the Senate to pass the bill as a separate piece of legislation, the Senate would have done so, thereby avoiding any possible constitutional challenge under this section. Given that they did not do so, it is clear that the votes were not there to pass it as a separate piece of legislation." Bablitch dissent at 572. While we share his concern about the potential for logrolling, Justice Bablitch presumes a fact that is not supported by the record. There is no indication in the record that there were insufficient votes to pass the MPCP as a separate piece of legislation in the Senate. A plausible alternative explanation could include the Senate's concern that a worthy

tion was passed by the assembly as a single subject bill.
Even though the senate included the MPCP as part of
the budget bill, the budget bill was debated by the senate
and the senate specifically amended the MPCP prior to
enactment of the budget bill. Clearly, the legislature
"intelligently participate[d] in considering" this pro-
gram. *Id.* Therefore, under the circumstances of this
case, it is proper for us to apply a presumption of consti-
tutionality to the process in which the MPCP was
enacted into law.[9] Applying a presumption of constitu-
tionality in this case was expressly authorized by the
*Brookfield* court where we stated:

piece of legislation may be thwarted by the close of a legislative
session. Without adequate evidence in the record, we are less
inclined to presume the evil that Justice Bablitch so strongly
suggests.

We are quite concerned about the dissent's indictment of the
legislature's integrity. The legislative branch exists to provide an
essential and valued function. Legislators are elected by the public
to represent the public's interest. Presumably, they are elected
based on many factors, including their wisdom and integrity. We
are unwilling to attack that integrity unless evidence exists to the
contrary.

[9]The circumstances of the present case allow us to presume
constitutionality for the process in which this legislation was
enacted. Justice Bablitch's analogy to the granting of a liquor
license is so dissimilar to the MPCP legislation that it merits very
little discussion. *See* Bablitch dissent at 574–75. We shall point
out only that the granting of a liquor license concerns only one or
few individuals and is not likely to grasp the attention of the
legislature. In contrast, improving educational quality is a state-
wide concern and, as mentioned, the record is replete with evi-
dence that the MPCP received a substantial amount of serious
deliberation by the legislature.

> [U]nder sec. 18, full scrutiny of the legislature, rather than the substituted process of smuggling through is the best determinant of need.
>
> Just as we seek not to err on the one hand by employing an inappropriate standard of deference through presuming constitutionality where such a presumption would render sec. 18 meaningless, *so equally we seek not to err on the other hand by substituting our judgment for that of an attentive legislature. . . .*
>
> *If such legislation is passed after full consideration . . . that will be the proper time to engage in the presumption of constitutionality . . ..*

*Brookfield,* 144 Wis. 2d at 918–19 n.6 (emphasis added). The burden of overcoming this presumption of constitutionality falls upon Chaney, et al., the parties attacking the statute.

Even though we conclude that there is no indication that the MPCP was smuggled or logrolled through the legislature without due consideration and we apply a presumption of constitutionality to such process, our analysis does not end here. Article IV, sec. 18 specifies certain procedural requirements that must be satisfied if legislation is found to be private or local. The previous discussion concerning legislative consideration is only relevant to the presumption of constitutionality portion of the analysis. It has no effect on our determination of whether the MPCP is a private or local bill. We now turn to the determination of whether the MPCP is private or local legislation.

This court has developed three prongs of analysis for cases involving a challenge to legislation as being private or local. The first prong of analysis involves legislation that is specific on its face as to particular people, places or things that allegedly runs afoul of art. IV, sec. 18. *See Milwaukee County v. Isenring,* 109 Wis. 9, 85

N.W. 131 (1901); *Monka v. State Conservation Comm.,* 202 Wis. 39, 231 N.W. 273 (1930); *Soo Line R. Co. v. Transportation Dep't,* 101 Wis. 2d 64, 303 N.W.2d 626 (1981); and *Milwaukee Brewers v. DH&SS,* 130 Wis. 2d 79, 387 N.W.2d 254 (1986). These cases explain that "such legislation is private or local within the meaning of sec. 18 and therefore prohibited unless the general subject matter of the provision relates to a state responsibility of statewide dimension and its enactment will have a direct and immediate effect on a specific statewide concern or interest." *Brookfield,* 144 Wis. 2d at 911.

The second prong of analysis involves legislation that is not specific on its face, but which involves classifications and allegedly runs afoul of the specific prohibitions of art. IV, sec. 31, which was adopted as an aid in a sec. 18 analysis. Section 31 explains specific areas in which the legislature is prohibited from enacting any special or private laws. The resolution of these cases depends on whether the legislation "falls into the category of matters upon which the legislature is competent to legislate pursuant to sec. 32 notwithstanding the prohibition of sec. 31." *Id.*

The third, and final, prong of analysis involves legislation that is not specific on its face, involves classifications, does not violate the provisions of sec. 31, but allegedly runs afoul of sec. 18. *See Brookfield v. Milwaukee Sewerage,* 144 Wis. 2d 896, 426 N.W.2d 591 (1988). A statute creating a closed classification can be the same as legislation that is specific on its face to a certain locality. In *Brookfield,* we determined that such cases must be analyzed consistent with the classification concepts developed in cases under art. IV, secs. 31 and 32. *Id.* at 912.

Five primary elements comprise the *Brookfield* test. These elements are as follows:

> First, the classification employed by the legislature must be based on substantial distinctions which make one class really different from another.
>
> Second, the classification adopted must be germane to the purpose of the law.
>
> Third, the classification must not be based on existing circumstances only. Instead, the classification must be subject to being open, such that other cities could join the class.
>
> Fourth, when a law applies to a class, it must apply equally to all members of the class.
>
> . . .[F]ifth, the characteristics of each class should be so far different from those of the other classes so as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation.

*Brookfield,* 144 Wis. 2d at 907–09. While these tests are similar to those used in the equal protection context, they are necessarily differently applied because sec. 18 and equal protection address quite different concerns.

The rationale for using the five-factor test was aptly explained in *Brookfield,* 144 Wis. 2d at 912–14 n.5. We shall not endeavor a reexplanation of that rationale here. We shall state only that sec. 18 addresses the form in which the legislation is enacted and not the substance of the legislation. In the classification legislation context, it is necessary to use the five-factor test to determine exactly what the substance of the legislation is in order to determine whether the procedural requirements of Wis. Const. art. IV, sec. 18 apply. Thus, although the

526

five-factor test "is used in both a sec. 18 context and an equal protection context, the tests are necessarily differently applied, given the quite different purposes of sec. 18 and equal protection." *Id.* at 913 n.5.

Notwithstanding the fact that the title of sec. 119.23, Stats., expressly mentions Milwaukee, the text of the MPCP as well as its placement in the statutes suggests that it involves a classification and should be analyzed under *Brookfield* rather than *Milwaukee Brewers.* The MPCP applies to any school district in a city of the first class. It is not limited to Milwaukee because Madison presently meets the population requirement and could become a city of the first class by a simple declaration. While the title of legislation expressly refers to Milwaukee, titles of statutes are not part of the statute itself.[10] We find no reason why this rule should not encompass legislative bills as well. Therefore, the MPCP is similar to the statute in *Brookfield* in that it involves a classification and not expressly a specific person, place or thing. Thus, we are required to apply the *Brookfield* five-factor test to determine whether the MPCP is private or local legislation.[11]

The first element of the *Brookfield* test requires that "the classification employed by the legislature must be

---

[10]Section 990.001(6), Stats.; *Wisconsin Valley Imp. Co. v. Public Service Comm.,* 9 Wis. 2d 606, 618, 101 N.W.2d 798 (1960).

[11]The court of appeals suggests that we adopt a modified *Brewers* test to accommodate "experimental" legislation. *Davis,* 159 Wis. 2d at 167. It is their contention that the nature of the experiment, not the classification, should be subject to the test for a private or local bill. However, creating such a test would unnecessarily further complicate this area of law. In this case, the classification tests adequately address and incorporate the nature of experimental legislation.

based on substantial distinctions which make one class really different from another." The MPCP does not create a new classification, but involves a classification that has consistently been recognized and accepted by this court: namely, cities of the first class. "Cities of the first class" is defined under sec. 62.05, Stats., as cities with a population of 150,000 or more. Presently, Milwaukee is the only city to declare itself a city of the first class in the state of Wisconsin.

██

In *Brookfield,* we acknowledged that the mere size of a particular city does not necessarily justify treating that city differently than any other city in the state. *Brookfield,* 144 Wis. 2d at 916. However, cities of the first class, by virtue of their large population and concentration of poverty, are substantially distinct from other cities. In *Camasco Realty Co. v. Milwaukee,* 242 Wis. 357, 377, 8 N.W.2d 372 (1943), where the challenged law pertained to cities of the first class, we noted that "the requirements of a metropolitan city like Milwaukee as against the smaller municipal corporations of the state are so obvious that any other result would be opposed to the public welfare." In *State ex rel. Nyberg v. Bd. of School Directors of the City of Milwaukee,* 190 Wis. 570, 577, 209 N.W. 683 (1926), this court upheld a statute regarding first class city school districts and stated that "there is a substantial basis for classifying for school purposes the large communities embraced in cities of the first class as established under our law and the smaller communities of the state."

School districts located in areas with monumentally oppressive poverty problems as found in first class cities have particular educational problems as well. These problems were recognized also in *Kukor v. Grover,* 148 Wis. 2d 469, 482–83, 436 N.W.2d 568 (1989). As demon-

strated by dropout rates, welfare statistics, and population data, the Milwaukee Public School District has significantly greater education and poverty problems than any other school district in the state.

Various statistical analyses, while not entirely consistent, dramatically show the need for legislative attention. The dropout rate for the Milwaukee Public Schools is higher than any other area in the state. For example, in the 1988–89 school year, the dropout rate for students in grades 9–12 in the MPS reached 14.4 percent.[12] In contrast, the public school dropout rate for the state at large during the 1988–89 school year was 3.11 percent, with no county, other than Milwaukee County, having a dropout rate of greater than 4.3 percent.[13]

During the 1988–89 fiscal year, Wisconsin spent $2.4 billion, or $499.57 per capita, on public welfare. Wisconsin ranked sixth among all states for welfare-related expenditures.[14] In 1988, over 50 percent of the general public assistance in Wisconsin was spent in Milwaukee County alone and the city of Milwaukee comprises about two-thirds of the population of Milwaukee County. Furthermore, of the $485 million spent in Wisconsin in 1988 for Aid to Families with Dependent Children, $213 million was allocated to Milwaukee County.[15]

The statistical data clearly illustrates that the socioeconomic disparities and the educational problems are

---

[12]Milwaukee Public Schools, *Indicators of Educational Effectiveness* 12 (1990).

[13]State of Wisconsin, Legislative Reference Bureau, *1991–92 Blue Book* 615 (1991).

[14]State of Wisconsin, Legislative Reference Bureau, *1991–92 Blue Book* 797 (1991).

[15]State of Wisconsin, Legislative Reference Bureau, *1989–90 Blue Book* 841 (1990).

greater in the large urban area of Milwaukee than any other part of Wisconsin. By definition, first class cities encompass large urban cities in Wisconsin, such as the city of Milwaukee. Therefore, we find that the classification of first class cities is based on substantial distinctions which make the class really different from all others. The first element of the *Brookfield* test is satisfied.

The second element of the *Brookfield* test requires that "the classification adopted must be germane to the purpose of the law." Both the trial court and the court of appeals concluded that the only reasonable inference to be drawn from the MPCP was that it was an experiment intended to address a perceived problem of inadequate educational opportunities for disadvantaged children. *Davis,* 159 Wis. 2d 164-65. We agree with this conclusion.

Improving the quality of education in Wisconsin is, without a doubt, a matter of statewide importance. It is apparent that on a national scale the educational needs of many students are not being met by the present educational structure and options. Average School Aptitude Test (SAT) scores fell from 978 in 1960 to just 870 in 1980.[16] Nearly 25 percent of public high school students drop out before graduation and the dropout rates for minorities often reach 50 percent. These are some of the highest dropout rates in the western world.[17]

The educational problems that the nation is experiencing are also evident in the Milwaukee Public Schools, where 55-60 percent of MPS students do not graduate from high school or do not graduate in a six-year period of time. A recent report by the Greater Mil-

[16]U.S. Department of Education, Center of Education Studies, *The Condition of Education: A Statistical Report* 20 (1987).

[17]Bast & Wittmann, *The Case for Education Choice* (1990).

waukee Education Trust states that only 40–45 percent of the students who start high school in the MPS graduate in four, five or six years. This completion rate is down from 57 percent in 1984. Of those who do graduate from high school, 36 percent graduate with a "D" average.[18] Students of MPS, in general, score below the national average on the basic skills tests, and minority students score dramatically below the average. The grade point average (GPA) on a scale of 4.0 for MPS students in general is 1.60, whereas the GPA for African-American students in the MPS is just 1.31.[19]

The consequences of school dropouts and inadequate education are shocking. High school dropouts comprise 75 percent of the prison population and 80 percent of the families receiving Aid for Families with Dependent Children. Only 55 percent of the male dropouts under age thirty have jobs and only 20 percent have full-time jobs.[20]

Recently, researchers have attempted to discover the reasons underlying inadequate public instruction. A Brookings Institution study examined data from more than 60,000 students in 1,000 public and private schools to test the relationship between 220 different variables. The study concluded that the three most important factors that affected student achievement were student ability, school organization, and family background. Chubb & Moe, *Politics, Markets & America's Schools* 140 (1990). The factor which is most amenable to legislative efforts appears to be school organization. In this

[18]*See* Gretchen Schuldt, *Many black freshmen at less than 'D'*, Milwaukee Sentinel, Apr. 23, 1991, at 1A.

[19]Milwaukee Public Schools, *Indicators of Educational Effectiveness* (1990).

[20]Public Policy Forum, *Public Schooling in the Milwaukee Metropolitan Area,* 37–39 (1988).

respect, the researchers found that "by itself, autonomy from bureaucracy is capable of making the difference between effective and ineffective organizations—organizations that would differ by a year in their contributions to student achievement."[21] *Id.* at 181. We find especially interesting the study's conclusion that the educational credentials of teachers, teachers' scores on competency tests, how teachers are paid and other formal qualities do not make a significant difference on student achievement. *Id.* at 186.

In response to the conclusions reached by the Brookings Institution study and others, the MPCP was drafted to include two main features to help fulfill the

[21]Chubb & Moe's conclusion that school organization can directly affect student achievement has been criticized by some commentators. For example, Professor John F. Witte of the University of Wisconsin-Madison Department of Political Science states that the comprehensive measure of school organization incorporates fifty variables and, thus, makes Chubb & Moe's analysis problematic and their combined inference totally unconvincing. Witte, "Public Subsidies for Private Schools: Implications for Wisconsin's Reform Efforts," the Robert M. LaFollette Institute of Public Affairs, University of Wisconsin-Madison 21 (1991). Professor Witte contends that the immense number of variables associated with school organization makes it almost impossible to isolate effects of specific organizational practices. *Id.*

However, in the absence of a constitutional challenge, it is not for us to determine the propriety of choosing one approach over another. This task is more appropriately undertaken by the legislature who is better equipped and possesses greater resources to hold public hearings and grasp public sentiment. As we stated in *State ex rel. Bowman v. Barczak,* 34 Wis. 2d 57, 65, 148 N.W.2d 683 (1967), "legislative decisions are more representative of popular opinion because individuals have greater access to their legislative representatives."

statewide purpose of improving education. The first feature empowers selected low-income parents to choose the educational opportunities that they deem best for their children. Concerned parents have the greatest incentive to see that their children receive the best education possible. Parental choice allows parents to send their children to nonsectarian private schools which, except for the statutory responsibilities of the State Superintendent, are autonomously operated free from the bureaucracy of the public school system. In so providing, the program will engender educational success competition between the public and private educational sectors for students of low-income families.

However, the program is not an abandonment of the public school system. Rather, the MPCP would affect at most only 1 percent of the students in the MPS, giving the program a very small window of opportunity to test the effectiveness of an alternative to the MPS.

Furthermore, the MPCP contains a second feature which not only should benefit the MPS but also the state at large. The second main feature of the MPCP creates an extensive data compilation and reporting process which the state can use to measure the effects of choice and competition in education. The experimental nature of the program is evident from these detailed compilation and reporting requirements.

The experimental nature of the program can also be inferred from the fact that the program, as originally drafted, would have been effective for only a five-year period of time. However, in a partial veto, the governor removed the five-year time limit. It is unclear whether the governor felt that the time limitation was too short or too long. It is apparent, though, that the governor and the legislature directed the gathering of extensive infor-

mation for the purpose of reacting to this experimental program.

The success of the program is dependent upon the participation of numerous and diverse nonsectarian private schools such that the fate of the program does not rest on the operations of one or a few schools. The record indicates that at least nine private schools in Milwaukee filed an intent to participate in the MPCP when it was first implemented. We assume no other city in Wisconsin offers as many private schools as Milwaukee. The significant availability of private schools is so necessary to a reliable sampling of alternative educational methods that it distinguishes a first class city such as Milwaukee from all other communities.[22] This experiment tests a theory of education. The possible failure in one or more private schools may be the fault of the school rather than the program's concept. Therefore, locating the program in a first class city such as Milwaukee where numerous and diverse private schools exist will enable the legislature to determine which, if any, of the private schools

[22]The scope of the MPCP was necessarily limited to the boundaries of a first class city. Such restriction in the scope of an experiment is necessary for the controlled, orderly, and efficient administration of the experiment. We do not conclude, as does Justice Bablitch's dissent, that "the authors of this legislation intended to benefit *only* private schools located within the city [of Milwaukee]." Bablitch dissent at 569. Rather, the intended beneficiary of the program is the state at large, which can learn from the results of the program. The fact that students participating in the MPCP may only attend private schools located within the first class city is merely a consequence of the boundaries of the experiment. Transportation costs require that available private schools be in the proximity of the students' residence. It would be impractical and absurd to transport a student participating in the program from Milwaukee to a La Crosse or even a Waukesha private school.

were most effective and why they are particularly successful in their mission of education.

We conclude that the classification of first class cities is germane to the purpose of the law. Clearly, improving the quality of education and educational opportunities in Wisconsin is a matter of statewide importance. The best location to experiment with legislation aimed at improving the quality of education is in a first class city, a large urban area where the socio-economic and educational disparities are greatest and the private educational choices are most abundant. The experimental nature of the MPCP places this case in direct contrast to *Brookfield* where we found no relationship between Milwaukee county's size and the challenged financing scheme. *See Brookfield,* 144 Wis. 2d at 920. Therefore, the second element of the *Brookfield* test is satisfied.

The third element of the *Brookfield* test requires that the classification not be based only on existing circumstances. Rather, "the classification must be subject to being open, such that other cities could join the class." Granted, the title of the statute is "Milwaukee Parental Choice Program." However, the statute is located in ch. 119, Stats., which addresses first class city schools and is applicable, by virtue of sec. 119.01, Stats., to cities of the first class. There are two requirements for a city to be of the first class. The city must have a population of at least 150,000 and the city's mayor must make an official proclamation that the city is of the first class. *See* sec. 62.05, Stats.

Presently, Milwaukee, with a population of 628,088, is the only city in Wisconsin which is officially a first class city. However, it is not the only city in Wisconsin which qualifies for such status, nor is the classification

535

limited only to Milwaukee. Madison is large enough to qualify as a city of the first class. Madison has a population of 191,262. If the mayor of Madison officially declares Madison to be a first class city, it will be subject to all legislation affecting cities of the first class, including the parental choice program. Therefore, we conclude that the classification is subject to being open and is not based only on existing circumstances. The third element of the *Brookfield* test is satisfied.

The fourth element of the *Brookfield* test requires that the law be applied equally to all members of the class. As mentioned earlier, there is only one member of the class at the present time. Milwaukee is the only official first class city. However, if Madison or any other qualifying city were to become an official first class city, then there appears nothing to indicate that the benefits and obligations of the MPCP would not equally apply to these additional members. Therefore, we find that the law would apply equally to all cities of the first class. The fourth element of the *Brookfield* test is also satisfied.

The fifth, and final, element of the *Brookfield* test which is applicable to the present case requires that "the characteristics of each class should be so far different from those of the other classes so as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation." The satisfaction of this element has already been addressed. *Supra* at 527–529. The immense disparity in the socio-economic conditions and educational problems in the MPS as well as the greatest potential private educational choices in the urban area of Milwaukee create the ideal testing ground for experimental legislation such as the MPCP.

Therefore, we find that the MPCP also satisfies the fifth element of the *Brookfield* test.

The MPCP satisfies all elements of the *Brookfield* classification test. Therefore, we hold that the MPCP is not a private or local bill within the meaning of Wis. Const. art. IV, sec. 18 and, thus, not subject to its procedural requirements. We emphasize that the MPCP is not a private or local bill because it satisfies the applicable tests, not because of the amount of legislative consideration afforded to it.

## II. THE UNIFORMITY CLAUSE

Wisconsin Constitution art. X, sec. 3 states:

> The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable; and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years.

This court has stated on several occasions that the requirement of uniformity "applies to the districts after they are formed,—to the 'character of instruction' given,—rather than to the means by which they are established and their boundaries fixed." *Kukor v. Grover,* 148 Wis. 2d 469, 486, 436 N.W.2d 568 (1989) (citing *State ex rel. Zilisch v. Auer,* 197 Wis. 284, 289-90, 223 N.W. 123 (1928)). Furthermore, the *Kukor* court concluded that "character of instruction" refers to that of "district schools" and is legislatively regulated by sec. 121.02, Stats.

Chaney argues that the MPCP violates the uniformity clause of Wis. Const. art. X, sec. 3. The thrust of Chaney's argument involves two steps: (1) the partici-

pating private schools are "district schools" within the meaning of the uniformity clause; and (2) by offering a "character of instruction" that is different from the one found under the mandate of sec. 121.02, the participating private schools violate the uniformity clause. The key to this argument is whether private schools participating in the MPCP are considered "district schools" for the purposes of the uniformity clause.

In *Comstock v. Jt. School Dist. No. 1,* 65 Wis. 631, 636-37, 27 N.W. 829 (1886), this court held that a statute allowing school districts to determine whether to admit nonresident school children did not violate the uniformity clause. In that case, we declared that "when the legislature has provided for each such child the privileges of a district school, which he or she may freely enjoy, the constitutional requirement in that behalf is complied with." *Id.* at 636-37. Thereafter, the legislature is free to act as it deems proper.

This sentiment was reiterated in several subsequent cases and most recently in *Kukor,* 148 Wis. 2d at 496-97. In *Kukor,* we found that a statutory school finance system did not violate Wis. Const. art. X, sec. 3 because every Wisconsin student has an opportunity to attend a public school with uniform character of instruction.

The MPCP unambiguously refers to nonsectarian private schools. "Private school" is a defined term under sec. 115.001(3r), Stats., and means "an institution with a private educational program that meets all of the criteria under s. 118.165(1) or is determined to be a private school by the state superintendent under s. 118.167." We assume that the legislature was aware of this statutory meaning and intended to use "private school" in the MPCP as a statutory term of art.

Similar to the legislation in *Kukor,* the MPCP in no way deprives any student the opportunity to attend a

538

public school with a uniform character of education. Even these students participating in the program may withdraw at any time and return to a public school. The uniformity clause clearly was intended to assure certain minimal educational opportunities for the children of Wisconsin. It does not require the legislature to ensure that all of the children in Wisconsin receive a free uniform basic education. Rather, the uniformity clause requires the legislature to provide the opportunity for all children in Wisconsin to receive a free uniform basic education. The legislature has done so. The MPCP merely reflects a legislative desire to do more than that which is constitutionally mandated.

Therefore, we hold that the private schools participating in the MPCP do not constitute "district schools" for purposes of the uniformity clause. The legislature has fulfilled its constitutional duty to provide for the basic education of our children. Their experimental attempts to improve upon that foundation in no way denies any student the opportunity to receive the basic education in the public school system.

Nevertheless, the MPS argues that the method which the state has chosen to fund the program indicates that the legislature considered this program part of the basic public education delivery system and, thus, subject to Wis. Const. art. X, sec. 3 requirements of uniformity. As noted earlier, participating private schools receive public monies under the MPCP for the education of participating students. Chaney argues that a school supported by public taxation is a "public school" by definition under sec. 115.01, Stats.

Under this theory, any school that accepted public monies would become a "district school" which is subject

539

to Wis. Const. art. X, sec. 3. However, this theory flies directly in the face of past decisions by this court. In *State ex rel. Warren v. Reuter,* 44 Wis. 2d 201, 216, 170 N.W.2d 790 (1969), we held that the appropriation of public funds to a private entity need only be accompanied by such controls as are necessary to fulfill the public purpose required. Depending on the circumstances, these controls do not necessarily have to be the same as those regulating similar public agencies. A more detailed analysis of this area is presented in the following issue.

In no case have we held that the mere appropriation of public monies to a private school transforms that school into a public school. We decline the opportunity to adopt such a conclusion here.

### III. THE PUBLIC PURPOSE DOCTRINE

Chaney also argues that the public purpose doctrine prohibits the legislature from authorizing the expenditure of public funds for the basic education of students to private schools without adequate supervision and controls. Therefore, Chaney concludes that the MPCP violates the public purpose doctrine because the program lacks adequate supervision and controls.

Although the public purpose doctrine is not an express provision of the Wisconsin Constitution, this court has long held that public expenditures may be made only for public purposes. *Reuter,* 44 Wis. 2d at 211. In *Reuter,* we stated, "[w]e need not go into the origin or the validity of the doctrine which commands that public funds can only be used for public purposes. The doctrine is beyond contention." *Id.*

In considering questions of "public purpose," a legislative determination of public purpose should be given great weight because " 'the hierarchy of community values is best determined by the will of the electorate' and that 'legislative decisions are more representative of popular opinion because individuals have greater access to their legislative representatives.' " *State ex rel. Bowman v. Barczak,* 34 Wis. 2d 57, 65, 148 N.W.2d 683 (1967) (citations omitted). Without clear evidence of unconstitutionality, "the court cannot further weigh the adequacy of the need or the wisdom of the method" chosen by the legislature to satisfy the public purpose. *State ex rel. Warren v. Nusbaum,* 59 Wis. 2d 391, 414, 208 N.W.2d 780 (1973).

No party disputes that education constitutes a valid public purpose, nor that private schools may be employed to further that purpose. Rather, the parties dispute whether the private schools participating in the MPCP are under proper government control and supervision, as required by *Wisconsin Indus. Sch. for Girls v. Clark Co.,* 103 Wis. 651, 668, 79 N.W. 422 (1899).

Chaney and, particularly, Superintendent Grover contend the controls in the MPCP over participating private schools are woefully inadequate and insist that these schools be subject to the stricter requirements of sec. 121.02, Stats. MPCP advocates, on the other hand, believe the statutory controls applicable to private schools coupled with parental involvement suffice to ensure the public purpose is met. The circuit court agreed with the MPCP advocates' contention, as we do.

■

The present situation is similar to that faced by this court in *Reuter.* In *Reuter,* we upheld an appropriation of public funds to the Marquette School of Medicine for

the purpose of providing quality medical education. *Reuter,* 44 Wis. 2d at 207. To test the propriety of expending public monies to a private institution for public purpose, this court must determine whether the private institution is under reasonable regulations for control and accountability to secure public interests. *Id.* at 215–16. "Only such control and accountability as is reasonably necessary under the circumstances to attach the public purpose is required." *Id.* at 216.

Chaney attempts to distinguish the present situation from *Reuter* in two main ways. First, Chaney argues that private schools participating in the MPCP may do whatever they want with the public money that they receive, whereas the funds in *Reuter* were earmarked for "medical education, teaching and research." Chaney is facially correct in that no express limitations exist on the use of the funds paid to private schools through the MPCP. However, the private schools must still provide their students with an education. It simply does not matter how the school spends the money so long as it gives the participating student an education that complies with sec. 118.165, Stats., in return for the money. Public schools face a similar situation. While the use of certain state aid to school districts is limited under sec. 121.007, Stats., the public schools must continue to provide a basic education to its students regardless of how and to what extent its programs and investments are funded.

Second, Chaney argues that private schools participating in the MPCP have no duty to demonstrate any institutional quality, whereas Marquette University was accredited by an independent national organization as well as federal and state agencies. *See Reuter,* 44 Wis. 2d at 217. In effect, Chaney is challenging the quality of

education provided by the private schools participating in the program.

The MPCP specifically allows participating students to attend a "nonsectarian private school." *See* sec. 119.23(2)(a), Stats. "Private school" has an express statutory definition under sec. 115.001(3r), Stats., which requires the institution to meet all of the criteria under secs. 118.165(1) or 118.167, Stats.

Under sec. 118.165, Stats., a private school must:

(1) be organized to primarily provide private or religious-based education;

(2) be privately controlled;

(3) provide at least 875 hours of instruction each school year;

(4) provide a sequentially progressive curriculum of fundamental instructions in reading, language arts, mathematics, social studies, science, and health;

(5) not be operated or instituted for the purpose of avoiding or circumventing compulsory school attendance; and

(6) have pupils return home not less than two months of each year unless the institution is also licensed as a child welfare agency.

Even though private schools are not subject to the same amount of controls which are applicable to public schools, they are subject to a significant amount of regulation which is geared toward providing a sequentially progressive curriculum. This issue is uniquely complicated, however, by the underlying thesis of the MPCP that less bureaucracy coupled with parental choice improves educational quality.

██ Keenly aware of this potential problem, the legislature included within the MPCP sufficient supervision and control measures. The State Superintendent is required to annually report to the legislature comparing the students participating in the MPCP with students in the MPS. The report includes data on academic achievement, daily attendance, percentage of dropouts, and percentage of pupils suspended and expelled. The State Superintendent is authorized to conduct financial and performance audits on the program, and the Legislative Audit Bureau is mandated to perform financial and performance evaluation. We believe that these detailed reports and evaluations in conjunction with the private school requirements under secs. 118.165(1) and 118.167, Stats., provide sufficient and reasonable control under the circumstances to attain the public purpose to which this legislation is directed.

██ Control is also fashioned within the MPCP in the form of parental choice. Parents generally know their children better than anyone. The program allows participating parents to choose a school with an environment that matches their child's personality, with a curriculum that matches their child's interest and needs, and with a location that is convenient. If the private school does not meet the parents' expectations, the parents may remove the child from the school and go elsewhere. In this way, parental choice preserves accountability for the best interests of the children.

In *Wisconsin v. Yoder,* 406 U.S. 205 (1972), the United States Supreme Court also recognized the importance and the strong tradition of parental choice in education. Using a balancing of interests test, the *Yoder* Court held that the First and Fourteenth Amendments

prevent the state from compelling Amish parents to cause their children to attend formal high school to age sixteen. *Id.* at 234. In so deciding, it stated:

> Providing public schools ranks at the very apex of the function of a State. Yet even this paramount responsibility . . . yield[s] to the right of parents to provide an equivalent education in a privately operated system.

*Id.* at 213. *Yoder* involved the protection of the Religion Clauses, whereas the present case involves purely secular considerations. However, the *Yoder* Court declared that purely secular considerations "may not be interposed as a barrier to *reasonable state regulation* of education." *Id.* at 215 (emphasis added). We have determined in this case that the reporting and private school requirements applicable to the MPCP provide sufficient and reasonable state control under the circumstances.

Further, the cost of education and the funds available for education are dependent upon the taxpayers' ability to fund an intensive public educational program. The amount of money allocated to a private school participating in the MPCP to educate a participating student is less than 40 percent of the full cost of educating that same student in the MPS. Each of the participating private schools is willing to accept the responsibility of educating a child for the $2,500 granted by the state.[23] In

---

[23]We hasten to note that the program does not appear to offer any financial advantage or windfall to the participating private schools. There is no evidence that the modest $2,500 per student that is received by participating private schools covers the cost of educating the student. The legislature determined the amount to be paid to the participating private schools without evidence of the actual cost incurred by the private school to

contrast, it costs the MPS an average of $6,451 to educate each student.[24] At most, $2.5 million of public funds will be appropriated to fund this experimental legislation. This amount is inconsequential compared to the more than $6.4 billion that is annually expended for public education in Wisconsin.[25] The amount of money to fund the MPCP represents only about four one-hundredths of one percent (.04 percent) of the public money allocated for public education throughout the state. Therefore, we hold that the MPCP does not violate the public purpose doctrine because the MPCP contains sufficient and reasonable controls to attain its public purpose.

We conclude that the Milwaukee Parental Choice Program passes constitutional scrutiny in all issues presented before this court. Accordingly, we reverse the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

LOUIS J. CECI, J. *(concurring).* Let's give choice a chance!

Literally thousands of school children in the Milwaukee public school system have been doomed because of those in government who insist upon maintaining the

provide an education to each enrolled student. Because $2,500 is less than 40 percent of the cost of educating a student in the MPS, we must assume that the participating private schools are either more efficient than public schools or discounting some of the cost to educate the students participating in the program.

[24]M. Fisher, "Fiscal Accountability in Milwaukee's Public Elementary Schools," *Wisconsin Policy Research Institute Report,* Vol. 3, no. 4 (Sept. 1990).

[25]State of Wisconsin, Legislative Reference Bureau, *1991-92 Blue Book* 620 (1991).

status quo. The sacred cow of status quo has led to the terrible problems that manifest themselves as described in the majority opinion.

The Wisconsin legislature, attuned and attentive to the appalling and seemingly insurmountable problems confronting socioeconomically deprived children, has attempted to throw a life preserver to those Milwaukee children caught in the cruel riptide of a school system floundering upon the shoals of poverty, status-quo thinking, and despair.

The dissent by Justice Bablitch attempts to paint a difference in that the schools that these deprived children would attend under this experimental program would be the recipients of "the state's largesse." Dissenting opinion at 569. IMAGINE THAT! If the expenditure of a mere $2,500.00 per child to teach the deprived children of the poor of the city of Milwaukee is—largesse— what foolishness are we engaged in when the taxpayers are spending approximately $5,000.00 for each of these same children in a failing public school system? The reason why the legislature adopted the classification of private schools specifically located in the city of Milwaukee is that the Milwaukee public school system evidently is viewed by the legislature as a failure despite the dedicated labors of its hundreds of teachers and administrators. Perhaps this experimental program will point the way for improvements that can be utilized throughout the public schools of this state.

As recently as December 11, 1991, Dr. Howard Fuller, Superintendent of the Milwaukee Public Schools, addressing some of the awesome problems of the school system, stated in a television interview that he was unwilling to let things be as they were. In other words, the status quo must go. While not addressing the school choice program, he was attempting to address the

547

problems that exist. More recently, the mayor of the city of Milwaukee has given his public voice of approval to the school choice program.

The dissent opts for maintaining the status quo. Justice Bablitch obviously does not now trust the legislative process he claims to know so well. His dissent is replete with anecdotal statements not a part of this record, and it is improper that such purported information, known to him alone, be used. Unfortunately, the dissent does not want to attempt to give choice a chance.

On February 22, 1989, less than two years ago, the dissent in *Kukor v. Grover,* 148 Wis. 2d 469, 531, 436 N.W.2d 568 (1989), stated:

> **The fashioning of a constitutional system of public education is not only the legislature's constitutional prerogative, it is far better equipped than any court to do it. I am not unaware of the terrible political complexities involved in fashioning such legislation, but I have full confidence in the legislature's ability to resolve it.**

(Emphasis added.) The author of the above-quoted dissenting opinion? Justice Bablitch.

Apparently the legislature has decided in this constitutionally proper experimental program to give choice a chance. I believe that the legislature has fashioned a constitutionally correct experimental program to deal with the terrible problems it is attempting to resolve. I join the majority opinion, with which I am in full accord.

Let's give choice a chance!

HEFFERNAN, CHIEF JUSTICE *(dissenting).* The Milwaukee Parental Choice Program, sec. 119.23, Stats., was enacted in violation of the procedures man-

dated by Wis. Const. art. IV, sec. 18, and as enacted substantively violates Wis. Const. art. X, sec. 3. It is clear from reading the majority opinion and the concurring opinion that the majority opinion reflects a tacit approval of the policy behind "choice." This is apparent from both the contrived expansion of the presumption of constitutionality and from the exhaustive attempt to portray the Milwaukee Public School system as a complete failure. Because the purported policy of choice is irrelevant to a constitutional challenge, and because the statute is constitutionally infirm both in form and in substance, I dissent.

The respondents challenge the statute on both procedural and substantive grounds. The method of constitutional review under procedural provisions such as art. IV, sec. 18 is distinct from constitutional review of the substance of a statute. As we explained in *Brookfield:* "In sec. 18 cases, because the legislature is alleged to have violated a law of constitutional stature which mandates the form in which bills must pass, the court will not indulge in a presumption of constitutionality, for to do so would make a mockery of the procedural constitutional requirement." *Brookfield,* 144 Wis. 2d at 912-13 n.5. The concept of a "presumption of constitutionality" is inappropriate when discussing legislative procedure.[1] One of the rationales that justifies the use of the presumption of constitutionality is that when the legislature follows the constitutionally mandated procedures, the democratic safeguards ensure that the law is the will of the legislature. Not so when a question of constitutional procedure arises.

[1]For example, it defies reason to consider whether a "rational basis" exists to believe a bill is not private or local. It either is or it isn't. Article IV, sec. 18 refers to a "private or local bill," not a "bill the legislature believes to be private or local."

The majority recognizes this principle, majority op. at 520, but ignores it because it concludes that choice was "debated extensively by the legislature and its various committees and agencies." Majority op. at 521. This conclusion is doubly troubling, because choice was never debated by the Senate, and because it also reveals a fundamental misunderstanding of review under art. IV, sec. 18.

The majority's novel and disturbing approach to determining whether a presumption of constitutionality exists derives from the discussion in footnotes 5 and 6 of *Brookfield* regarding whether a sham or fraud has occurred in the legislature. I disagree with the majority's distillation of *Brookfield.* Article IV, sec. 18 does more than protect against legislative fraud—it ensures accountability. Quite simply, a legislator must vote separately on private or local matters, and must answer to his or her constituency for those votes. *See Brewers,* 130 Wis. 2d at 145 (Steinmetz, J., concurring in part and dissenting in part), and 156–58 (Ceci, J., concurring in part and dissenting in part). It begs the question to presume that because the choice program was not "smuggled" that it is not in fact a private or local law.

Review of the level of consideration or deliberation accorded a particular piece of legislation is an improper intrusion into the legislative process. Moreover, it is impossible. The majority's astonishing conclusion that choice was "debated extensively" by the entire legislature, despite the fact that it was neither separately debated nor voted upon in the Senate—as it should have been as a local bill—offers a clear example of the inappropriateness of review by judges of the deliberative process of the legislature. Review under art. IV, sec. 18 should be limited to the face of the bill, and nothing more. I agree with Justice Abrahamson that a presump-

tion of regularity attaches to the legislative procedure. As this court stated in *Integration of Bar Case,* 244 Wis. 8, 28, 11 N.W.2d 604 (1943): "The law does not presume that a public officer violates his duty." The challenging party should be required to prove that the bill, on its face, is private or local. That proof is manifold.

Regardless of the presumption accorded the choice legislation, it is apparent that its passage as a part of a multi-subject budget bill violated art. IV, sec. 18. The title of the bill, its "experimental" nature, and the startling statistics cited by the majority regarding the Milwaukee Public School system leave no doubt that the law is private and local and intended to apply only to the city of Milwaukee. The statute, as was the bill, is entitled "Milwaukee Parental Choice Program." The text of the statute consistently refers to "the city." And while the title is not a part of a statute, it is a constitutional requirement that the legislature must caption a private or local bill under art. IV, sec. 18. In this case the title demonstrates that the choice program was specifically tailored for Milwaukee.

The majority's exposition of why Milwaukee and its public school system is so different from other cities is self-defeating—the classification under whose aegis this legislation purports to come is cities of the first class, not Milwaukee—and underscores the fact that the program is aimed only at Milwaukee. As the court of appeals noted:

> When applying [the *Brookfield*] test, we cannot consider the specific characteristics of Milwaukee and its social and educational problems, even though it is presently the only member of the class. Our analysis must be limited to the characteristics of the chosen classification. The *Brookfield* court examined only the general qualities of a first class sewerage district,

not the characteristics of the Milwaukee area sewerage district.

*Davis v. Grover,* 159 Wis. 2d 150, 162, 464 N.W.2d 220 (Ct. App. 1990). The majority states that "cities of the first class, by virtue of their large population and concentration of poverty, are substantially distinct from other cities." Majority op. at 528. While it may be fair to characterize Milwaukee as having a "large concentration" of poverty, it cannot be said that all first class cities will necessarily share this attribute. It also cannot be said that the poverty in Milwaukee is necessarily any different or worse than poverty elsewhere in the state. Anyone who is aware of conditions statewide must know that there are areas outside of Milwaukee and outside of incorporated municipalities where poverty is acute. The fact that Milwaukee, which has over 150,000 residents and has declared itself to be a first class city, arguably has numerically more persons living in poverty than smaller cities, does not make it "substantially distinct" from other cities such that "it is necessary for them, as opposed to all other" cities, to have the choice program. *Brookfield,* 144 Wis. 2d at 916. I conclude that the choice program fails under the first test of *Brookfield* that "the classification employed by the legislature must be based on substantial distinctions which make one class really different from another." *Id.* at 907.

The majority goes on to conclude that because choice is "experimental" legislation, the classification is germane to the purpose of the law and therefore is a general, not a private or local law.[2] Two things strike me

[2]The very proposition that the program is "experimental" is an admission that the program is aimed directly at Milwaukee—that is, it is both private and local. Certainly the possibility that Madison, currently the only city other than Milwaukee with

about the conclusion that the choice program is experimental. First, it is not clear at all that the program is an experiment. Second, assuming that it is experimental, it is no less private or local. An unconstitutional experiment is unconstitutional.

The majority opinion and Justice Abrahamson's dissenting opinion agree that the choice program is experimental. I am unconvinced that this is so, and if so that is constitutionally irrelevant. Nothing in the language of the statute indicates that it is "experimental." There is no statement of a legislative purpose to conduct an educational experiment. Nothing in the statute provides for expansion of the program if it proves successful. Governor Thompson's veto of the five-year sunset provision detracts from rather than adds to the argument that the legislation is experimental.[3] It indicates that the governor, who is a part of the legislative process, vetoed the "experimental" time limitation of the statute. The majority seemingly bases its conclusion that the program is experimental on the fact that public educa-

a population exceeding 150,000, may declare itself a first class city is irrelevant to the structure of the "experiment." Thus, if the program is truly experimental, the *Brewers* analysis should apply. Under *Brewers,* 130 Wis. 2d at 113, the legislation would clearly fail because the program will have no "direct and immediate effect" upon a matter of statewide concern. The immediate effects of sec. 119.23, Stats., are local and private. If the legislation is valid as a general law, there is no reason to defend it as experimental.

[3]The majority states that it is "unclear whether the governor felt that the time limitation was too short or too long." Majority op. at 533. This, of course, is irrelevant. What is clear is that the bill which the governor approved has no sunset clause. He specifically vetoed the experimental language of the legislation. All we know is that the governor did not agree that "choice" was a program that was limited to an experimental period.

tion in Milwaukee and across the nation faces severe problems, and from the auditing and reporting provisions contained in sec. 119.23, Stats. If the majority's assertion is that public education across the nation is in the same crisis as Milwaukee, this in itself demonstrates the impropriety of the classification. The remedy, which treats Milwaukee differently, is a non-germane separate classification. In the sense that choice can be inferred to be one legislative attempt to address a serious societal problem, all legislation addressing problems where the solution is not evident is experimental and subject to change in the will of the legislature. The financial audits and reports authorized or mandated by the statute are common ways of reviewing publicly funded programs. Indeed, the majority notes these same provisions in its conclusion that the program satisfies the public purpose doctrine.

While the majority's conclusion that choice is experimental, in the sense that all legislation is, is logically defensible, calling the law "experimental" in the absence of a clearly expressed legislative intent is the type of post-hoc justification this court rejected in *Brookfield,* 144 Wis. 2d at 918 n.6. And as stated above, from a constitutional point of view it is irrelevant that it may be experimental. On its face, the legislation is not an experiment, and for art. IV, sec. 18 purposes this court should look no further. From the face of the legislative document it is apparent that the legislation specifically was drafted to address the tremendous problems facing the Milwaukee Public School system, and, as Justice Bablitch concludes, and I join in his conclusion, that the legislation is an attempt to provide funding to private schools which are located only within the city of Milwaukee.

Experimental legislation is not exempt from the strictures of the constitution. It is not germane to limit the experiment to the largest city in the state, or to any distinct class of cities in the state. I agree with the reasoning of the court of appeals:

> Why the experiment should be made only in a first class city is not apparent. That a city has a population of 150,000 and its mayor has proclaimed that it is a city of the first class, as provided in sec. 62.05(1)(a) and (2), Stats., has no relation to whether the experiment should be conducted in such a city. Cities of smaller size may be equally satisfactory sites for this experiment. Nor does a mayoral proclamation show greater suitability for this educational experiment. The city of Madison, for example, meets the population criterion to become a first class city, but has not yet declared itself to be one. Madison would not become a more appropriate site for the experiment merely by making such a proclamation.

*Davis,* 159 Wis. 2d at 165 (footnote excluded). Thus, the choice legislation fails the second test of *Brookfield* that "the classification adopted must be germane to the purpose of the law." *Brookfield,* 144 Wis. 2d at 907.

I conclude that sec. 119.23, Stats., is a private and local law enacted in violation of art. IV, sec. 18. Finally, I am fully in accord with Justice Abrahamson's rationale and conclusion that as enacted the choice legislation substantively violates Wis. Const. art. X, sec. 3.

I respectfully dissent and would affirm the decision of the court of appeals.

SHIRLEY S. ABRAHAMSON, J. *(dissenting).* The majority opinion declares constitutional the "experimental" Milwaukee Parental Choice Program, which involves less than one percent of the city's school popu-

lation and, according to the majority, an "inconsequential" amount of funding. Majority op. at 513, 527 n.11, 530, 539. I dissent even though I have concluded that the majority opinion has very limited application. Any increased coverage of the program or continuation of the program beyond a reasonable time for experimentation could still fall victim to a successful constitutional attack.

Despite the majority opinion's limited application, I dissent because I believe that the existing Parental Choice Program violates art. X, the Education Article, of the Wisconsin Constitution. I would affirm the decision of the court of appeals.

I.

First, I conclude that the Parental Choice Program violates the mandate of art. X that the legislature provide a system of free public education for children of a certain age.[1] To determine the constitutionality of the Parental Choice Program the court must look to the words of art. X, the constitutional debates and educational practices in existence in 1848, and the earliest interpretations by the legislature. *State v. Beno,* 116 Wis. 2d 122, 136–37, 341 N.W.2d 668 (1984). If these sources do not provide an answer, the court will look to "the objectives of the framers in adopting the provision." *Beno,* 116 Wis. 2d at 138.

---

[1]The majority devotes a mere three and a half pages, less than ten percent of its opinion, to the question whether the legislation satisfies the constitutional requirement of the educational uniformity clause, art. X, sec. 3, an issue of first impression. It devotes seven pages (about 19 percent) to the issue of public purpose.

The language of art. X does not grant the legislature authority to create district schools. The legislature has that authority without art. X.[2] Article X *compels* the legislature to exercise its authority to create district schools; it commands the legislature to establish a specific educational system—district schools, statewide uniformity, and free tuition for children of certain ages. *Manitowoc v. Manitowoc Rapids,* 231 Wis. 94, 98, 285 N.W. 403 (1939). In other words, art. X prohibits the legislature from refusing to establish district schools. *Zweifel v. Joint Dist. No. 1 Belleville,* 76 Wis. 2d 648, 657, 251 N.W.2d 822 (1977); 64 O.A.G. 24, 25–26 (1975). The legislature could not disband the public school system and pay every student in the state or every private school a sum for education. The state constitution through art. X, unlike the federal Constitution, makes an equal opportunity for government-supported education a fundamental right of the student and a fundamental responsibility of state and local government. *Kukor v. Grover,* 148 Wis. 2d 469, 488, 436 N.W.2d 568 (1989); *Buse v. Smith,* 74 Wis. 2d 550, 569, 247 N.W.2d 141 (1976).

In 1846 when Wisconsin's first constitution was drafted, substantially all schooling was private. 37 O.A.G. 347, 349 (1948). Although art. X was debated at the convention, support for wholly publicly funded district schools was virtually unanimous. The constitutional plan was an express rejection of and remedy for the patchwork system of diverse schools with mixed public and private funding that existed during the territorial period. Article X mandates a state system of free

[2]The state constitution is not a grant of power to the legislature but a restriction on legislative authority. *Outagamie County v. Zuehlke,* 165 Wis. 32, 35, 161 N.W. 6 (1917).

public education.[3]

From art. X's command to the legislature to establish publicly funded education and its extensive provisions for a general system of free public schools, I conclude that the constitution prohibits the legislature from diverting state support for the district schools to a duplicate, competitive private system of schools.[4] It seems clear that the constitutional system of public education was intended to be the only general school instruction to be supported by taxation. No Wisconsin case has interpreted the constitution as permitting the legislature to create a system of publicly financed private schools that operates in competition with the district schools in delivering basic education.[5]

[3]*Kukor v. Grover,* 148 Wis. 2d 469, 518, 436 N.W.2d 568 (1989); Alice Smith, *The History of Wisconsin* 576 (1973); Erik LeRoy, Comment, *The Egalitarian Roots of the Education Article of the Wisconsin Constitution: Old History, New Interpretation, Buse v. Smith Criticized,* 1981 Wis. L. Rev. 1325, 1344–50.

[4]Wisconsin educators have always been aware of the potential detrimental effect of competing private schools on public schools. Responding to charges of "immorality" in the public schools, one early state superintendent asked: "But . . . was not this the fault of the private schools? Was not the removal of the best scholars the most severe blow that could be dealt the public schools? Did it not produce the very inferiority that was condemned?" Lloyd P. Jorgenson, *The Founding of Public Education in Wisconsin* 188 (1956) (citing *Wisconsin Journal of Education* 2:23–25 (July 1857)).

[5]In 1869, about twenty years after the adoption of the constitution, Justice Paine advanced a similar interpretation of art. X. In a case where a private law authorized the town of Jefferson to levy a tax to aid in the construction of buildings for a private educational institution, Justice Paine reasoned that granting public funding for the private school was invalid under art. X because art. X implied that the public system was designed to be the only

Under the Parental Choice Program, tax money earmarked for the public schools is transferred to private schools, enabling them to compete directly with public schools in supplying basic primary education. The majority opinion correctly concludes, majority op. at 538, that the legislature is free to establish free public educational programs beyond those that are constitutionally mandated. *See, e.g., Manitowoc v. Manitowoc Rapids,* 231 Wis. 94, 97–98, 285 N.W. 403 (1939). In this case, however, the Parental Choice Program does not augment but instead supplants the educational programs the constitution requires the legislature to provide in public schools. I therefore conclude that the Program violates art. X.

My second reason for concluding that the Parental Choice Program is unconstitutional is that the Program does not ensure that the students who receive basic education through public funding in participating private

instruction to be supported by taxation. "Our constitution provides for a general system of public free schools. . . . And from the general and extensive character of the provisions upon this subject, I think there is some implication that this system was designed to be exclusive, and to furnish the only public instruction which was to be supported by taxation." *Curtis's Administrator v. Whipple,* 24 Wis. 350, 360 (1869) (Paine, J., concurring).

Chief Justice Hallows, writing for the court in *State ex rel. Warren v. Reuter,* 44 Wis. 2d 210, 170 N.W.2d 790 (1969), concluded that *Manitowoc v. Manitowoc Rapids,* 231 Wis. 94, 98, 285 N.W. 403 (1939), rejected Justices Paine's view. *Reuter,* 44 Wis. 2d at 221. *Manitowoc* does not support Justice Hallows' conclusion. The *Manitowoc* court held that art. X, sec. 3 does not prohibit the legislature from providing free education to people beyond the ages of four through twenty. *Manitowoc* therefore stands only for the proposition that the legislature may augment the free public education system the constitution mandates in art. X.

schools receive an education as nearly uniform as practicable to that received by other students who receive basic education through public funds. Article X, sec. 3, requires the legislature to "provide by law for the establishment of district schools, which shall be as nearly uniform as practicable . . .."[6]

Interpretation of the uniformity provision is difficult because the language is ambiguous and the framers of the constitution did not discuss this particular clause. *Kukor,* 148 Wis. 2d at 519 (Heffernan, C.J., Abrahamson, J. & Bablitch, J., dissenting); Erik LeRoy, *The Egalitarian Roots of the Education Article of the Wisconsin Constitution: Old History, New Interpretation, Buse v. Smith Criticized,* 1981 Wis. L. Rev. 1325, 1350. Nevertheless, the court has derived at least two principles from art. X and from the educational practices in Wisconsin at the time of the adoption of the constitution to govern the interpretation of art. X, sec. 3.

This court has repeatedly asserted the principle that art. X, sec. 3 "applies to the districts after they are formed, —to the character of the instruction given, —rather than to the means by which they are established and their boundaries fixed." *Kukor,* 148 Wis. 2d at 486 (quoting *State ex rel. Zilisch v. Auer,* 197 Wis. 284, 290, 223 N.W. 123 (1928)). Therefore we know that the framers were not concerned in art. X, sec. 3, with the structure of the school system established[7] but with the

---

[6]Article X, sec. 3 provides in full:

The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable; and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years; and no sectarian instruction shall be allowed therein; but the legislature by law may, for the purpose of religious instruction outside the district schools, authorize the release of students during regular school hours.

[7]*See also Larson v. State Appeal Board,* 56 Wis. 2d 823,

character of instruction or "the training that these schools should give to the future citizens of Wisconsin." *Kukor,* 148 Wis. 2d at 486 (quoting *Zilisch,* 197 Wis. at 290).

The majority opinion, however, focuses on the organization of the schools providing the education and not on the character of the education provided in interpreting the term "district schools."

The second principle is that the framers of the 1848 constitution viewed uniform public education as the means to strengthen democracy by allowing knowledgeable participation in all public affairs. LeRoy, *supra,* 1981 Wis. L. Rev. at 1325–26, 1345–46. "A general system of education was the only system on which we could depend for the preservation of our liberties." *Kukor,* 148 Wis. 2d at 488 (quoting *Journal and Debates of the Constitutional Convention* 238 (1847–48)). Uniform public education provided a unifying force for the citizens of diverse heritages who settled in the new state of Wisconsin. "Universal Education," *Milwaukee Sentinel & Gazette* (August 22, 1846), *reproduced in* Milo M. Quaife, *The Movement for Statehood* 188 (1918); LeRoy, *supra,* 1981 Wis. L. Rev. at 1347.[8] The majority opinion,

---

827–28, 202 N.W.2d 916 (1973); *Joint School District v. Sosalla,* 3 Wis. 2d 410, 420, 88 N.W.2d 357 (1958).

[8]The framers reinforced this concern for the content of education when they required local financial support for the schools in art. X, sec. 4. The framers believed that local financial contributions would focus local attention on the operation of the schools and the education of their children. "No adequate interest was felt by the people, in common schools, unless they contributed to their support." *Journal and Debates of the Constitutional Convention* 335 (1847–48).

Article X, sec. 4 states:

Each town and city shall be required to raise by tax, annually, for the

however, permits the legislature to subvert the unifying, democratizing purpose of public education by using public funds to substitute private education for public education without the concomitant controls exerted over public education.

Article X, sec. 3 requires the legislature to ensure that all Wisconsin children who receive basic education through public funding receive a uniform education reflecting the shared values of our state. By failing to guide adequately the education of students who participate in the Parental Choice Program, the legislature has failed to obey its constitutional mandate.

## II.

The majority opinion devotes nearly three quarters of its lengthy opinion to the issue whether this experimental program is a private or local bill passed contrary to the procedural requirements set forth in art. IV, sec. 18, Wis. Const.[9] This case once again proves that "the constitutional language embodied in sec. 18, art. IV, is easily understood but not easily applied. . . . The task of deciding what constitutes a local or private law as opposed to a general law has been the source of difficulty in this state . . .." *Soo Line R.R. Co. v. Department of Transp.*, 101 Wis. 2d 64, 73, 303 N.W.2d 626 (1981),

---

support of common schools therein, a sum not less than one-half the amount received by such town or city respectively for school purposes from the income of the school fund.

Article X, sec. 2 established the school fund from the proceeds of the sale of lands that the United States granted to Wisconsin upon its attaining statehood.

[9]Article IV, sec. 18 states:

No private or local bill which may be passed by the legislature shall embrace more than one subject, and that subject shall be expressed in the title.

*quoted with approval in Milwaukee Brewers v. DH&SS,*
130 Wis. 2d 79, 107, 387 N.W.2d 254 (1986). Other states
have had the same difficulty with similar provisions in
their constitutions.

Unfortunately this court's prior opinions, and the
majority and two dissenting opinions in this case, have
not set forth analyses and tests that the legislature, the
public, lawyers, circuit courts or the court of appeals can
apply with any certainty or confidence. No one can be
sure, until this court decides, probably by a closely
divided vote, whether a law sets forth a classification
making the *Brookfield* test applicable, *Brookfield v. Milwaukee Metro. Sewerage Dist.,* 144 Wis. 2d 896, 426
N.W.2d 591 (1988), or is specific to a person or place
requiring the application of the *Milwaukee Brewers* test,
and whether the law passes constitutional muster under
either test.[10] Chief Justice Heffernan's and Justice Bablitch's dissents add the possibility of the court's not
accepting the legislature's classification, recharacterizing
the legislation, and testing the court-imposed classification for constitutionality.

The majority opinion, like the court's prior opinions, again fails to explain the overlap between the classification test under art. IV, sec. 18, and the test under
the state constitutional equal protection guarantee.[11]

More significantly, while upholding the constitutionality of the statute, the majority opinion has mandated an analysis that seriously infringes on the legislature's autonomy. The majority opinion applies a

---

[10]Why should this court apply a different test to a statute
referring to Milwaukee than it would to a statute referring to first
class cities?

[11]*See* Keith Levy, *Constitutional Limitations on Appropriations,* 11 UCLA-Alaska L. Rev. 189, 200-02 (1982); *State v. Lewis,* 559 P.2d 630, 642-43 (Alaska 1977).

presumption of constitutionality only when the legislature has "adequately considered or discussed" or "intelligently participated in considering" the bill at issue. Majority op. at 522, 523.[12] Nothing in the constitution directly or indirectly empowers this court to measure the legislative consideration of a bill for adequacy or intelligence. This court's grading the deliberations of the legislative branch inappropriately invades the functions of the legislative branch and misconstrues art. IV, sec. 18.

If the majority believes a law tested under art. IV, sec. 18, a procedural provision, requires a different presumption than the presumption of constitutionality generally accorded a law tested under a substantive constitutional provision, and I do not think it does, I suggest that the court accord the law challenged under art. IV., sec. 18, a presumption of regularity.[13]

---

[12]All decisions prior to *Brookfield* evaluating a challenge under art. IV, sec. 18 or the similar provisions of art. IV, secs. 31 and 32 applied a presumption of constitutionality. *See, e.g., Soo Line,* 101 Wis. 2d at 76; *Madison Metro. Sewerage Dist. v. Stein,* 47 Wis. 2d 349, 356-57, 359 (1970); *Milwaukee County v. Isenring,* 109 Wis. 9, 24 (1901); *Johnson v. City of Milwaukee,* 88 Wis. 383, 391 (1894). *See also* 2 C. Dallas Sands, *Sutherland Statutory Construction* sec. 40.06, at 215 (1986 Rev. ed.); 1 C. Dallas Sands, *Sutherland Statutory Construction* sec. 2.04, at 29 (1986 Rev. ed.).

[13]I continue to wonder why courts and litigants rely on the concepts of presumption of constitutionality and proof of unconstitutionality beyond a reasonable doubt without discussing what these concepts mean in the particular case. What does the presumption mean in terms of what evidence is needed? Does the presumption affect how the evidence is to be presented? What is the significance of who bears the burden of proof? What is the application of the presumption when the facts are undisputed and only the question of constitutionality, that is a question of law, is presented? *See, e.g., Milwaukee Brewers,* 130 Wis. 2d at 125-31

The constitution speaks of private or local bills; the constitution does not talk about smuggling or degrees of the legislature's awareness of the subject matter of bills. Our opinions interpreting art. IV, sec. 18, should formulate as simple a test as possible for determining whether a law is private or local, the issue addressed by the state constitution, without considering "smuggling."

Because the legislature has the power to enact private and local laws as separate laws and because the statutes are replete with laws affecting only first class cities or specific people or places in the state, I believe the court should, in deference to the separation of powers doctrine, exercise restraint in declaring laws unconstitutional under art. IV, sec. 18. The court should invalidate a statute on the basis of the form of the statute only in exceptional cases where the private and local aspects are pervasive and only a general statewide interest appears.

For the reasons set forth, I dissent. I would affirm the decision of the court of appeals.

WILLIAM A. BABLITCH, J. *(dissenting)*. I make no judgment, public or private, as to whether "choice" is good public policy. That issue is not presented nor is it appropriate for us to so decide.[1] But no one can disagree

(Abrahamson, J., dissenting); *State ex rel. Briggs & Stratton v. Noll,* 100 Wis. 2d 650, 663-64 (1981) (Abrahamson, J., dissenting). *See generally* Williard Hurst, *Dealing With Statutes,* 87-99 (1982).

[1] In a concurring opinion of less than one page, the refrain "Let's give choice a chance!", or similar verbiage, is repeated four times. The issue here is not whether we agree with the policy choice made by the legislature, the issue is the process by which the policy was enacted into law. The policy of whether "choice" should be law in this state is a legislative decision. It is no more

that "choice" is major public policy involving fundamental educational decisions. And no one can disagree that it merited full legislative consideration.

It did not receive such consideration. In fact, it received no consideration whatsoever in the senate.

"Choice" was never debated in the senate. It never received a public hearing in the senate. No expression of public sentiment was ever sought by the senate nor received. There was no separate vote taken on it in the senate. It passed the senate as part of the budget bill four legislative days after the senate received it as a separate piece of legislation from the assembly. *See* 1989 Wisconsin Assembly Bulletin, 169; 1989 Senate Bulletin 148–149. The committee in the senate to which the original bill was referred never even dealt with it.

Yet the majority opinion inexplicably concludes that "choice" was "greatly debated in legislative committee public hearings and by the entire legislature." Majority op. at 512 (citation omitted) (footnote omitted). "[W]e find no evidence in this case that suggests the program was smuggled or logrolled through the legislature without the benefit of deliberate legislative consideration . . .. Clearly, the legislature 'intelligently participate(d) in considering' this program." *Id.* at 522–523.

The evidence, contrary to the assertions of the majority opinion, is overwhelming that the senate never "intelligently participate[d] in considering" this program. On Wednesday, March 15, 1990, the Wisconsin Assembly passed Assembly Bill 601, The Milwaukee Parental Choice Program, and sent it to the Wisconsin

appropriate for judges to applaud a policy decision of the legislature in this context than it is to disparage it. When the court challenge is based on process, it is totally inappropriate and judicially indefensible for judges to base their decision on whether they agree with the policy or not.

Senate. It was immediately referred to the Senate Educational Financing Committee where no action was ever taken. Five days later (which includes Saturday and Sunday), on Monday, March 20, 1990, this bill was tucked into the budget bill by the Joint Finance Committee. One day later, on Tuesday, March 21, 1990, the budget passed the senate. The "choice" plan was part of that bill. See 1989 Wisconsin Assembly Bulletin, 169; 1989 Senate Bulletin 148-149.

The majority, having concluded that "choice" was debated extensively by the legislature, affords it a presumption of constitutionality. The majority then, after analyzing only one of two classes that the legislation creates, concludes that it is not a private or local bill within the meaning of article IV, section 18.

I agree with Chief Justice Heffernan that the legislation fails the "private or local" constitutional prohibitions of article IV, section 18 with respect to the classification of school children who live in the city of Milwaukee. That is the first classification created by the law, and that is what the majority addresses. What most observers are unaware of, and what the majority does not address, is that the bill creates a second classification which also violates art. IV, sec. 18: private schools located within the city limits of Milwaukee. These are the only eligible recipients of the state's $2.5 million annual outlay for this program. This is an annual outlay, payable only to a small group of eligible private schools, and will continue to be paid for out of state taxpayers' funds, unless and until it is repealed by the legislature. If the legislature wanted this to be law, it could constitutionally do so only as a separate piece of legislation, considered separately by each house of the legislature, and not as part of a "must pass" omnibus budget bill. Including private legislation in a "must pass" omnibus

budget bill, particularly when that legislation receives no consideration in one house of the legislature other than the vote on the budget itself, is precisely what leads to the internal logrolling in the legislature which members of the majority opinion have in the past found so deplorable.[2] Accordingly, I dissent.

The legislation in question provides that only school children in school districts located within cities of the first class may participate; their "choice" is limited to private schools located within the city of Milwaukee. Thus, the legislation adopts two classifications: 1) school children residing in cities of the first class and attending school districts within cities of the first class; and, 2) private schools located within cities of the first class. The majority opinion addresses only the first classification and finds it constitutionally unobjectionable because, in essence, cities of the first class have the most educational problems (the first prong of the classification tests, e.g. real differences); and because this legislation is "experimental" in nature (the second prong of the classification tests, e.g. germaneness).

Missing in the majority's analysis, completely missing, is any meaningful discussion whatsoever with

---

[2]The majority opinion, in footnote 8 expresses concern at what it perceives to be this dissent's "indictment of the legislature's integrity." That is utter codswallop! The challenge here is to the process by which a bill becomes law. The conclusion of this dissent that the process was constitutionally defective is no more an indictment of the legislature's integrity than were a number of past decisions of this court, some of which the author of this majority opinion participated in and agreed with, that found other legislation "private or local" and therefore violative of article IV, section 18. *See, e.g., Soo Line R. Co. v. Transportation Dep't,* 101 Wis. 2d 64, 303 N.W.2d 626 (1981); *Brookfield v. Milwaukee Sewerage,* 144 Wis. 2d 896, 426 N.W.2d 591 (1988).

respect to the second classification that this legislation also adopts; private schools located within cities of the first class. Had the majority subjected this second classification to the very same classification tests they applied to the first classification, it could not pass constitutional muster.

The first prong of the classification tests provides that the classification employed must be based on substantial distinctions which make one class really different from another. How are private schools located within cities of the first class "really different" from all other private schools located in the state of Wisconsin? To ask the question is to answer it; there are no differences. None are posited by the petitioners, none are discernible. Yet under this legislation a private school located within the city of Milwaukee can be the recipient of the state's largesse, a private school located just outside the city limits cannot. One can only conclude that the authors of this legislation intended to benefit only private schools located within the city, and there are no reasons given to support that discrimination.

The second prong of the test provides that the classification adopted must be germane to the purpose of the law. The majority opinion argues quite cogently that this is "experimental" legislation. The petitioners argued this same point extensively in their briefs and at oral argument. Assuming both petitioners and the majority are correct in that hypothesis, then how is it that only private schools located in the city of Milwaukee can test that experiment? Why not private schools located in the suburbs of Milwaukee, or any other private school? The classification adopted, private schools located in the city of Milwaukee, is simply not germane to the avowed purpose of educational experimentation. Any other private school, located anywhere in the state, is equally capable

of providing the documentation needed to assess this experiment. Again, just as in the first test, one can only conclude that the authors of this legislation intended to benefit only private schools located within the city, and there are no reasons given nor discernible that support that restriction.

The legislation as drafted puts the emphasis on the first classification. But the above analysis becomes clearer if one simply re-states the legislation and puts the emphasis on the second classification. Assume the legislation said: "Any nonsectarian private school located in the city (of the first class) shall receive $2,500 per year for each student who resides in the city (of the first class) and attends the private school providing that all of the following apply: (Here, the bill would state all the criteria listed in the actual legislation)." With this re-drafting, everything ends up the same as the original legislation. But now it becomes clear why this legislation is constitutionally objectionable. "Why should private schools in Milwaukee be treated preferentially?" one would legitimately ask. "Why should they get this $2.5 million annually and not us?" private schools in suburbs of Milwaukee and other cities in Wisconsin would ask. "What is it about them that makes them different from us?" The answers are obvious. There are no reasons.

I do not doubt the sincerity of the authors of this legislation with respect to their belief that "choice" is good public policy. It may be, it may not be. I make no judgment as to that. Perhaps school children who reside in Milwaukee will be major beneficiaries of such a program. But this legislation also targets another beneficiary, a very small group of private schools located only in the city of Milwaukee who will collect the amount of $2.5 million annually. This benefit is not subject to debate. It is their's until the legislature decides otherwise.

There is a principle at stake here which has been cited numerous times in our previous cases; legislation which benefits only a few must rise or fall on its own merits, and not be a part of a "must-pass" bill. The basis for this principle was recently stated in a concurring and dissenting opinion in *Milwaukee Brewers v. DH&SS,* authored by Justice Ceci:

> The prison siting legislation, buried deep within the budget bill, represents the very worst of the logrolling and railroading practices which have become all too commonplace in the legislature.
>
> . . ..
>
> The very design of art. IV, sec. 18 is disregarded in the legislative practice whereby a provision such as the prison-siting legislation is included in a budget bill. Such a practice breeds unaccountable represen-tation: it necessarily forces a legislator to vote once on two separate matters. A legislator is forced to vote on a matter of statewide importance and promi-nence—the budget in this instance—the same way in which he or she will vote on a wholly unrelated sub-ject—here, the siting of a prison in the Menomonee Valley. An affirmative or negative vote on the overall bill necessitates the vote extending to all subject mat-ter within the bill. I find such a practice to be deplorable and untrue to the spirit of art. IV, sec. 18. Certainly the representatives' respective constituen-cies, which may well have different opinions about the logrolled issues, deserve to have their views be fully represented by separate voting on separate issues.
>
> We do not require that the general electorate vote a straight party ticket; we should not tolerate legislative practices which dictate that only a single vote be cast on wholly separate issues. Such a prac-tice is, at best, a modified form of logrolling, which is

prohibited by statute. Such a practice destroys the accountability of our representatives and reduces the legislature to an internally acquiescent institution, unresponsive to the constituency it purports to represent. *Milwaukee Brewers v. DH&SS,* 130 Wis. 2d 79, 156-157, 387 N.W.2d 254 (1986) (footnote omitted).

This principle was also discussed by a different justice in the same opinion in his dissenting and concurring opinion:

The [majority's] test still requires legislators to vote for a comprehensive budget bill with its many concerns and fiscal necessities without voting directly on matters of private or local effect. Accountability is sacrificed, not because legislators are unaware of the private or local provisions of the budget bill, but because they cannot vote their convictions on such provisions without affecting the entire budget bill. Contrary to the majority's conclusion, therefore, a legislator could credibly claim to oppose a local or private provision, despite voting for the entire budget bill. *Milwaukee Brewers,* 130 Wis. 2d at 145.

The principles stated in these prior opinions have however been ignored by their authors who inexplicably have joined the majority in this case. The majority opinion here glosses over these principles by pointing out that a similar separate bill had been passed by the Assembly and "all" the Senate did was include it in the omnibus budget bill. But that gloss completely disregards the legislative history of "choice" in the senate. As explained above, this was never debated in the senate, it never received a public hearing in the senate, there was no expression of public will. It passed the senate as part of the budget four legislative days after it was received from the assembly.

The majority's gloss also ignores another obvious implication. If there were sufficient votes in the Senate to pass the bill as a separate piece of legislation, the Senate would have done so, thereby avoiding any possible constitutional challenge under this section. Given that they did not do so, it is clear that the votes were not there to pass it as a separate piece of legislation. It needed to be tucked into the budget in order to snare otherwise negative votes of senators who felt they had to vote for the omnibus budget bill because of other policy items in the budget they supported which had a higher priority than this "choice" legislation.[3] That is precisely what Section 18 seeks to prohibit; it is precisely what our former opinions attempted to address.

I turn next to the discussion in the majority opinion regarding the presumption of constitutionality that should or should not attach to this legislation. The majority adopts a middle ground which will only serve to confuse. Better had they simply stated that either a presumption of constitutionality always attaches to this type of legislation or it does not. From their opinion, one can only guess as to how much deliberation is sufficient for the presumption to attach.

I conclude a presumption of constitutionality should never attach to legislation that is challenged as being procedurally unconstitutional, as opposed to legislation

---

[3]The majority suggests, in a footnote that responds to this part of the dissent, that "a plausible alternative explanation could include the Senate's concern that a worthy piece of legislation may be thwarted by the close of a legislative session." Majority op. at 522. If that is a plausible alternative explanation, it is equally repugnant. Is the majority suggesting that "worthy" legislation can escape the constitutional imperatives of article IV, section 18 if such legislation comes up at the end of the legislative session?

that is challenged as being substantively unconstitutional. The challenge under article IV, section 18 is a procedural challenge. The other challenges to this legislation are substantive, and therefore deserve the presumption. But the two challenges are completely distinct and should be treated as such.

The procedural challenge here asserts that the legislature failed to follow essential procedural steps mandated by our constitution. The challenge, in essence, is that the legislation on its face is private or local and was included in a multisubject bill, and is therefore violative of article IV, section 18. No one disagrees that on its face the legislation is private or local and was part of a multisubject bill. Why, then, is such legislation entitled to a presumption that it is constitutional? On its face, it clearly is not. Neither logic, common sense, nor precedent requires a presumption of correctness when on its face it is not correct. Our only obligation in such a situation is to determine whether the legislation fits within one of the narrowly circumscribed exceptions that have been carved out by this court. If anything, logic would tell us that legislation that on its face is unconstitutional starts with a presumption that it is not constitutional. But I do not argue for that proposition; I urge only that in such a situation, no presumption should attach either way. When legislation that is private or local on its face and could have been passed as a separate piece of legislation, with all the legislative scrutiny that entails, is instead passed as a part of a multisubject bill, it does not warrant a presumption of constitutionality. Because of the potential for abuse that is present in such a situation, it deserves careful scrutiny with no presumption attaching.

Perhaps an example might make this clearer. Assume that an Assembly Bill granted a liquor license to

John Jones of Middleton. Assume also that this bill received the precise treatment that the legislation at issue in this case received. That is, assume it received a public hearing in the Assembly committee with much public testimony, and then assume it passed the Assembly; that it went to the Senate, but the Senate did not consider it separately; and assume that it was then included in the multisubject budget bill and then passed. Assume then the liquor license legislation (that was passed into law as part of the budget) is then challenged as being a "private or local" law. Under the majority's view, this legislation would be entitled to a presumption of constitutionality. That strikes me as being absurd. Yet it is not different from the legislation before us. Other examples of classification legislation could be equally forthcoming. Legislation that on its face is "private or local" (as is classification legislation as well as specific entity legislation), that is part of a multisubject bill, that is challenged as being violative of section 18, has no presumption of constitutionality.

The majority's conclusion rests on their belief that this legislation deserves the presumption because of the attention this issue received in the process. Putting aside the problem addressed earlier in this dissent that the senate never even debated it, that conclusion invites confusion. What, in the future, will constitute sufficient "attention" so as to deserve the presumption? The scenarios under which a bill that passes one house but gets sidetracked in the other, and then appears in the budget bill, are almost infinite in number. And yet the majority gives the same presumption of constitutionality to that situation as attaches when both houses pass the bill. The presumption does not apply, if for no other reason than the simple fact that when a bill passes one house but fails to pass in the other, and then magically appears in

the budget, that usually means there were not sufficient votes to pass it on its own merits. Nothing of significance in the legislative process "just happens."

The majority does not need their presumption analysis to reach the result they reached. They should discard it in favor of the black letter rule which this court adopted three years ago. Only confusion can result.

In conclusion, the result reached by the majority leaves the law regarding article IV, section 18 in serious disarray in two major respects. First, with respect to classification legislation, the result in this case cannot stand alongside the recently decided case of *Brookfield v. Milwaukee Sewerage,* 144 Wis. 2d 896, 426 N.W.2d 591 (1988). Although *Brookfield* involved Milwaukee sewers and this case involves Milwaukee schools, the principles are precisely the same, the results are diametrically opposed. Members of the public, practitioners, and perhaps most importantly the legislature, cannot now state nor predict with any degree of certainty what the law is regarding whether a piece of legislation is "private or local." The second serious problem involves the presumption of constitutionality and when it attaches. The majority's test of legislative consideration simply cannot stand the test of time. The majority's test has no certainty, and therefore no predictability.