Shirley KRUG, Fred Risser, Ervin Nowak, James Palmer, Robert & Betty Gloudeman, Delene Hansen, Fay Amerson, Rebecca Young, Tammy Baldwin and Spencer Black, Plaintiffs-Appellants,

v.

Cathy S. ZEUSKE, James R. Klauser, and Charles H. Thompson, Defendants-Respondents,

HOFFMAN CONSTRUCTION COMPANY, Kaiser Construction, Inc., Mashuda Construction, Inc., Pagel Construction, and James Peterson Sons, Inc., Intervening Defendants-Respondents.

Court of Appeals

*No. 94–3193. Submitted on briefs July 27, 1995.—Decided January 18, 1996.*

(Also reported in 544 N.W.2d 618.)

For the plaintiffs-appellants the cause was submitted on the briefs of *Lynn Adelman* of *Adelman, Adelman, & Murray, S.C.,* of Milwaukee.

For the defendants-respondents the cause was submitted on the brief of *James E. Doyle*, attorney general, with *Gerald S. Wilcox*, assistant attorney general.

For the intervening defendants-respondents the cause was submitted on the brief of *Robert J. Smith, Carl A. Sinderbrand,* and *Hugh N. Anderson*, of *Wickwire Gavin, P.C.*, of Madison.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

EICH, C.J.   We hold in this case that several 1994 laws authorizing payment of approximately $300,000 to state highway contractors to cover increased fuel costs incurred by them in performing the contracts is unconstitutional.

The law was challenged by a group of state legislators, taxpayers and local elected officials, on grounds that the payments constituted "extra compensation" to

409

the contractors in violation of article IV, section 26, of the Wisconsin Constitution, which prohibits the legislature from granting "any extra compensation to a . . . contractor after the services have been rendered or the contract has been entered into." The trial court granted summary judgment, declared the law constitutional, and dismissed the plaintiffs' action. We reverse the order.

The facts are not in dispute. Prior to August 1990, the Wisconsin Department of Transportation entered contracts with several road grading contractors for various highway improvement projects. As a result of the Iraqi invasion of Kuwait in the summer of 1990, gasoline and other fuel prices increased significantly. After the contracts were performed, five contractors submitted claims to the department to recoup their increased fuel costs. In support of their claims, the contractors argued that a 1982 interdepartmental memorandum, which stated that the department would provide "fuel adjustments on select grading projects," obligated the state to pay their claims. The department denied the claims, pointing out that the contracts did not provide for fuel cost adjustments and that the memo was extraneous to the bidding and contracting process. The department also believed the payments would violate article IV, section 26.

The contractors took their case to the state claims board.[1] The board overturned the department's deci-

---

[1] The claims board, comprised of two legislators and representatives of the governor's office and the departments of administration and justice, is empowered to receive and investigate claims "presented against the state" as referred by the department of administration, and to make recommendations to the legislature for payment or non-payment. Sections 15.105 (2) and 16.007(1), STATS. The statute provides, "No claim or bill

sion and recommended that the legislature pay the claims. The legislature did so. Bills appropriating a total of $305,049.32 to be paid to the five contractors as "reimbursement for unanticipated fuel cost increases" were passed and signed into law by the governor in 1994. 1993 Wis. Acts 431-435.

The plaintiffs sued the state treasurer and the secretaries of the departments of administration and transportation in circuit court, seeking to enjoin the payments as unconstitutional. The contractors intervened and all parties moved for summary judgment. The defendants sought dismissal of the action. The trial court granted the defendants' motions and dismissed the plaintiffs' complaint, holding that the laws were constitutional or, alternatively, that fuel adjustment provisions could be read into the several contracts as a result of the 1982 interdepartmental memorandum.

Our review of summary judgments is de novo; we apply the same methodology as the trial court and consider the legal issues independently, without deference to the trial court's decision. *Hake v. Zimmerlee*, 178 Wis. 2d 417, 420-21, 504 N.W.2d 411, 412 (Ct. App. 1993). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party has established its entitlement to judgment as a matter of law. *Germanotta v. National Indem. Co.*, 119 Wis. 2d 293, 296, 349 N.W.2d 733, 735 (Ct. App. 1984). And where, as here, both sides move for summary judgment "we generally consider the facts to be stipulated, leaving only questions of law for resolution." *Rock Lake*

relating to such a claim shall be considered by the legislature until a recommendation thereon has been made by the claims board." Section 16.007(1).

411

*Estates Unit Owners Ass'n v. Township of Lake Mills*, 195 Wis. 2d 348, 356 n.2, 536 N.W.2d 415, 418 (Ct. App. 1995).

■

As a general rule, "[s]tatutes carry a heavy presumption of constitutionality and the challenger has the burden of proving unconstitutionality beyond a reasonable doubt." *Employers Health Ins. Co. v. Tesmer*, 161 Wis. 2d 733, 737, 469 N.W.2d 203, 205 (Ct. App. 1991). It follows that "[e]very presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality." *State ex rel. Hammermill Paper Co. v. La Plante*, 58 Wis. 2d 32, 46, 205 N.W.2d 784, 792 (1973). We are not concerned with the wisdom or appropriateness of the legislation but only with its validity in light of specific provisions of the constitution. *Id.* at 47, 205 N.W.2d at 793.

The plaintiffs argue, however, that the laws in question should not enjoy the presumption of constitutionality because they concern matters of legislative procedure, not substantive law. They refer us to *City of Brookfield v. Milwaukee Metro. Sewerage Dist.*, 144 Wis. 2d 896, 912 n.5, 426 N.W.2d 591, 599 (1988), where the supreme court held that the presumption of constitutionality does not apply where the constitutional provision sought to be enforced relates only to the "form in which bills must pass" and not to the substance of the legislation. The constitutional provision under consideration in *City of Brookfield* and similar cases, however, was not article IV, section 26, but rather the "private bill" section of article IV, section 18, which states that "[n]o private or local bill which may be passed by the legislature shall embrace more

412

than one subject, and that shall be expressed in the title." Because that section "assess[es] the constitutionality of the process in which the legislation was enacted" instead of "the constitutionality of the substance of [the] legislation," the presumption of constitutionality does not apply. *Davis v. Grover*, 166 Wis. 2d 501, 520, 480 N.W.2d 460, 466 (1992).

We reject the plaintiffs' argument that article IV, section 26, like article IV, section 18, is procedural only: that its sole concern is "the manner in which legislation is to be adopted." Article IV, section 26, does not simply set forth procedure for the passage of bills; it affirmatively and plainly prohibits the payment of compensation to state contractors over and above the contract price. And while we have found no case addressing the precise issue, we do note that the supreme court has applied the presumption to the extra compensation clause of section 26 in at least one case, *State ex rel. Thomson v. Giessel*, 265 Wis. 558, 565, 61 N.W.2d 903, 907 (1953).

We conclude, therefore, that the presumption of constitutionality applies to our consideration of the plaintiffs' challenge.

The defendants argue that the plaintiffs have not met their burden of proving unconstitutionality beyond a reasonable doubt. Relying principally on *Milwaukee County v. Halsey*, 149 Wis. 82, 136 N.W. 139 (1912), they argue that because the payments authorized by the challenged laws are limited to reimbursement for the contractors' "actual expenses,"[2] they do not consti-

---

[2] The plaintiffs do not dispute the defendants' assertion that the contractors' claims for payment do not include any sums for "salary, labor, profit or other mark-up."

tute "compensation" within the meaning of article IV, section 26. We disagree.

In *Halsey*, the legislature authorized the payment of $400 per year to circuit court judges " 'for . . . necessary expenses' " incurred in the performance of their duties over and above their statutory salaries.[3] *Id.* at 85, 136 N.W. at 141 (quoting Laws of 1889, ch. 263). The law was challenged under a separate provision in article IV, section 26, prohibiting increases in judges' "compensation" during their terms of office. *Id.* at 85, 136 N.W. at 141. The supreme court upheld the constitutionality of the law, concluding, in essence, that "compensation" means "salary," and that because the law "expressly distinguished the sum so awarded [to the judges] from salary," there was no constitutional violation. *Id.* at 87, 136 N.W. at 141.

*Halsey* is plainly distinguishable. *Halsey* deals with not only a different constitutional provision but also a different factual situation.[4] The contractors in

---

[3] In 1912 there were only five judicial circuits in Wisconsin, and the judges were required to travel to and from several counties to hold court. The judges' annual salaries were set at $3,600, and the legislation provided that each judge was to receive an additional $400 per year " 'as and for his necessary expenses while in the discharge of his duties as such judge.' " *Milwaukee County v. Halsey*, 149 Wis. 82, 85, 136 N.W. 139, 141 (1912) (quoting Laws of 1889, ch. 263).

[4] The same may be said with respect to another case cited by the defendants, *Geyso v. City of Cudahy*, 34 Wis. 2d 476, 149 N.W.2d 611 (1967), where the court considered whether a municipal ordinance similarly barring increases or decreases in the salaries of local officials during their terms of office prohibited the municipality from increasing the officials' expense allowances in mid-term. The court upheld the increases, holding that "[t]he words salary and expense are separate and distinct terms which connote entirely different concepts." *Id.* at

414

this case are not public officials who have been allocated an "allowance for expenses," as were the judges in *Halsey, id.* at 87, 136 N.W.2d at 141, or who receive a "fixed salary payable out of the public treasury of the state," see *Board of Supervisors v. Hackett*, 21 Wis. 613, 617 (1867), or for costs incurred during the performance of official duties. They are private contractors, and the constitutional provisions at issue bar the legislature from granting them extra compensation over and above that established in their contracts.[5]

We consider *Carpenter v. State*, 39 Wis. 271 (1876), despite its age, to be far more instructive on the "extra compensation" language of article IV, section 26. In *Carpenter*, the secretary of state had apparently promised to pay a state printing contractor not according to

---

483, 149 N.W.2d at 614. *Geyso*, like *Halsey*, is distinguishable on both the facts and the law.

[5] Two other cases, cited by the defendants as limiting the term "compensation" to salary or wages, are also inapposite. In the first, *Board of Supervisors v. Hackett*, 21 Wis. 613 (1867), the supreme court defined compensation as "signif[ying] the return for the services of such officers as receive a fixed salary," *id.* at 617; the court did not address article IV, section 26, in the context of private persons or entities, such as the contractors in this case, who do not receive a salary, public or otherwise.

The second case, *Gename v. Benson*, 36 Wis. 2d 370, 153 N.W.2d 571 (1967), did not involve the constitution at all. It was a private contract action where a housekeeper sought to recover from her employers on a *quantum meruit* theory, and the issue was whether she had already been "compensated" for her services. In the course of its discussions of that issue, the court noted, in *dicta*, that "reimbursement for expenses is not compensation," and went on to hold that the payments already received by the housekeeper had fully compensated her for the services rendered. *Id.* at 377, 153 N.W.2d at 574.

Neither case advances the defendants' position.

the terms of the contract but for the actual cost of materials and the value of his labor. When the legislature declined to consider the contractor's claim for increased payment based on his actual costs, he sued. The supreme court held that payment of the claim, even if ratified by the legislature, would be unconstitutional.

> Such compensation of a public contractor is prohibited by [section 26]. Whether the prices of the contract were high or low, reasonable or unreasonable, the plaintiff has or had a right to recover them against the state; and neither secretary nor legislature could abridge that right. But he had and has no right to recover for his work and material at different prices, and neither secretary nor legislature could or can, by any agreement or legislation, give him such a right. The exact measure of his right is determined absolutely by his contract, under the constitution; and there exists nowhere a discretion to vary it.

*Id.* at 282-83. The court also noted that the purpose of the excess contract compensation language of section 26 was "to save the legislature from the importunity of public contractors and servants, and the treasury from the discretion of the legislature in their favor; to limit contractors with the state, beyond pretense and device, to the precise compensation fixed by their contracts," and it concluded, "Where there is no fraud or mistake . . . the contract itself must govern." *Id.* at 284-85.

■

The highway contractors in this case, like the printing contractor in *Carpenter*, contracted to provide "work and material" to the state at an agreed price, and they now seek to vary the terms of payment. As in *Carpenter*, if their bids turned out to be low, the con-

tractors would be bound by the contract, just as the state would be required to pay the contract rate if the accepted bids turned out to be high. A similar result is compelled here. Giving 1993 Wis. Acts 431-435 every presumption of constitutionality, we are satisfied beyond a reasonable doubt that they are unconstitutional as providing extra compensation to the contractors within the meaning of article IV, section 26.[6]

Finally, we address the alternative holding of the trial court: that even if the additional payments are considered "compensation," they do not constitute "extra" compensation under section 26 because the 1982 interdepartmental memorandum had the legal effect of incorporating a fuel adjustment clause into the 1990 highway contracts.

The memorandum begins by discussing an earlier practice of the department of "implement[ing] cost adjustment provisions (escalators) for cement, asphalt

---

[6] Both the state defendants and the contractors argue cursorily that whether the payments to the contractors constitute "extra compensation" is a question of legislative "fact" and thus beyond our review. It is true that courts, in assessing a law's constitutionality, may not "reweigh the facts as found by the legislature." *State ex rel. Strykowski v. Wilkie*, 81 Wis. 2d 491, 506, 261 N.W.2d 434, 441 (1978). The defendants do not explain, however, what those legislatively found facts are, other than to suggest that the legislature, in passing the challenged laws, must have concluded that it was not granting the contractors any extra compensation in violation of article IV, section 26. We reject the notion that the legislature can find, as a matter of legislative fact, that a statute is constitutional and thus preclude judicial inquiry into that "fact." It goes without saying that determining the constitutionality of statutes is a function of the courts; it is not a matter of conclusive self-declaration by the legislature.

and fuel on appropriate contracts." The practice had been adopted in 1979 because of "the contractor's inability to procure price quotes at the bidding stage for critical materials which were subject to extreme market fluctuations" at that time. And although the department stated in the 1982 memo that a change in the earlier practice was appropriate because "there no longer exists support for continuing the price adjustment provisions as initiated in 1979," it proposed "insert[ing]" fuel adjustments on "select grading projects" in order to "continue to receive the most competitive and favorable grading prices."[7]

We do not consider the 1982 interdepartmental memorandum, as the contractors would have us do, as an agreement or "commitment" by the department "to provide fuel cost adjustments" on all future grading projects. At best, the memorandum expressed the department's intention, in 1982, to provide for such adjustments on "select grading projects" and to implement the policy by "insert[ing]" such adjustment provisions in the specifications for "appropriate . . . projects." There is nothing in the record to indicate that the department determined any of the 1990 contracts to be either eligible or "appropriate" for the inclusion of fuel adjustment clauses in the job specifications, or

---

[7] The memorandum stated in pertinent part:

In order for the Department [of Transportation] to continue to receive the most competitive and favorable grading prices, we will continue to provide for fuel adjustments on select grading projects. [A] . . . fuel adjustment specification . . . will be inserted by the central office on appropriate major grading projects taking into consideration the time of letting, anticipated progress of the work and expected carry-over into subsequent calendar years.

. . . Should future market conditions change, we propose to initiate cost adjustments when and where warranted.

that any such provisions were included in the contract documents or specifications.

We agree with the plaintiffs that the most that may be gleaned from the 1982 memorandum is that fuel adjustment clauses would be placed in select contracts when the department deemed it appropriate to do so and that none were placed in the contracts at issue here.[8]

Because we hold that 1993 Wis. Acts 431-435 are unconstitutional and reject the defendants' "contract" arguments, we reverse the decision and order of the circuit court holding to the contrary.

*By the Court.*—Order reversed.

DYKMAN, J. (*dissenting*). I agree with the majority's interpretation of article IV, § 26 of the Wisconsin Constitution. Thus, the question for me is whether the State contracted in advance to pay road grading contractors for increased fuel costs or whether the fuel cost adjustment payments were after-the-fact payments

---

[8] The contractors also suggest that the memorandum constituted an "offer" by the department to grant fuel adjustments to contractors who submitted the most competitive and "favorable grading prices," and that the state should be estopped from denying fuel adjustments to those contractors submitting bids in reliance on that "offer." An offer, however, is not a promise, and the law distinguishes promises from statements of intention or opinion, " 'and from a mere prophecy.' " *Goetz v. State Farm Mut. Auto. Ins. Co.*, 31 Wis. 2d 267, 273, 142 N.W.2d 804, 807 (1966) (quoted source omitted). " '[A] mere expression of intention or general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer.' " *Id.* (quoted source omitted).

made to the contractors because of escalating fuel prices caused by the Iraqi invasion of Kuwait.

This is a mine-run contract case, once the constitutional issue is resolved. I view the question for review as whether the materials submitted on summary judgment demonstrate that the State directed construction and design engineers to include contractual fuel cost adjustment clauses in contracts for some or all of the projects.

Because this case is here on summary judgment, I agree that we follow the methodology explained by the majority. A party is entitled to summary judgment if there are no disputed issues of material fact. *Germanotta v. National Indem. Co.*, 119 Wis. 2d 293, 296, 349 N.W.2d 733, 735 (Ct. App. 1984). After examining the affidavits submitted by the parties, we may reach one of the following three results: (1) the affidavits unambiguously demonstrate that the State intended to include fuel cost adjustment clauses on select projects but only after an individualized inquiry into the facts of a particular contract; (2) the affidavits unambiguously demonstrate that the State intended that all grading contracts have fuel cost adjustment clauses; or (3) the affidavits are ambiguous because reasonable persons could interpret them either way. The trial court chose the second interpretation while the majority chooses the first.

The material submitted by the legislators in support of their motion for summary judgment consists of 1993 Senate Bills 516 through 520, the memorandum written by Michael E. Jaskaniec, a draft copy of the proposed fuel cost adjustment clause, and a contract between the Wisconsin Department of Transportation (DOT) and the Vinton Construction Company. The defendants submitted an affidavit signed by David

Hoffman, the president of Hoffman Construction Company and a member of the Wisconsin Road Builders Association.

Because the Jaskaniec memorandum is critical to deciding this case, I quote it in its entirety:

Date:    February 3, 1982

To:      District Director, District # —

         Attn:    Chief Construction Engineer
                  Chief Design Engineer

From:    Michael E. Jaskaniec, P.E.
         Chief Construction Engineer

Subject: Cost Adjustment Provisions

By memo of July 27, 1979, the Districts were provided background information and guidelines for the implementation of cost adjustment provisions (escalators) for cement, asphalt and fuel on appropriate contracts. The principal justification for price adjustments was the contractor's inability to procure price quotes at the bidding stage for critical materials which were subject to extreme market fluctuations. The very competitive and stable bids received over the past three years supports the effectiveness of these provisions.

In the monitoring of market indicators we have reasonable confidence that adequate supply and moderate price structuring has stabilized critical material availability relating to contract bidding. Accordingly, there no longer exists support for continuing the price adjustment provisions as initiated in 1979. This position has been reviewed with construction industry representatives and concurred in with the exception of the grading industry. The graders, representing the highest unit users of fuel (20% - 40% of cost) continue to express substantial

concern regarding the potential for extreme impacts of fuel costs to work under contract as a result of Mid-East instabilities. In order for the Department to continue to receive the most competitive and favorable grading prices, we will continue to provide for fuel adjustments on select grading projects. This fuel provision is a new and simplified approach and completely changed from our previously used fuel adjustment specification. For your information, we have attached a draft copy of the proposed specification. It will be inserted by the central office on appropriate major grading projects taking into consideration the time of letting, anticipated progress of the work and expected carry-over into subsequent calendar years. The cost adjustment will be based on changes in the Department's index and applied to final quantities on the final estimate. Hopefully, this new approach will limit administrative problems, limit contractor's risk and continue to provide a favorable bidding environment. We encourage the districts to assess their major grading projects in consideration of the foregoing and make a recommendation in their PS&E letter as to the appropriateness of the fuel provision.

The Department will continue to monitor and publish monthly material indexes for asphalt, cement and fuel. Should future market conditions change, we propose to reinitiate cost adjustments when and where warranted.

Feel free to forward any comments, questions or concerns you may have regarding this transmittal.

By
Chief Construction Engineer

The Hoffman affidavit states that DOT "agreed and committed to provide fuel cost reimbursements

422

when warranted due to major market fluctuations." Hoffman further averred:

> Hoffman Construction Company and other grading contractors have consistently relied on this DOT agreement and commitment. We have consistently bid on projects using then existing fuel prices without any additional component to account for market fluctuations, and have relied in good faith on DOT's representation that it would reimburse extraordinary fuel expenses due to market fluctuations.

Pursuant to summary judgment methodology, I must consider whether the Jaskaniec memorandum, the fuel cost adjustment clause, and the Hoffman affidavit create disputed issues of material fact. *Germanotta*, 119 Wis. 2d at 296, 349 N.W.2d at 735. I conclude that this material could reasonably be interpreted to support the legislators' position. The use of the term "select grading projects" can reasonably mean that if a fuel cost adjustment clause is appropriate for a particular project, the fuel cost adjustment clause would be inserted in the contract. Since the clause was not included in the defendants' contracts, reimbursing the contractors for increased fuel costs would be after the fact and, therefore, violate art. IV, § 26 of the Wisconsin Constitution.

But the material could also be reasonably interpreted to support the defendants' position. The Jaskaniec memorandum refers to all cost adjustment provisions, not just those for fuel. A part of the memorandum specifically refers to the grading industry and the prior practice of "price adjustment provisions." It uses the word "continuing" in reference to the prior practice. It concludes: "Should future market conditions change, we propose to reinitiate cost adjustments

when and where warranted." The memorandum was addressed to district directors, not to road grading firms. In his affidavit, Hoffman averred that he relied upon the Jaskaniec memorandum when submitting bids containing no fuel cost adjustment clauses. He averred that DOT represented that it would reimburse extraordinary fuel expenses.

A reasonable interpretation of the same summary judgment material could be that the road graders got their information about the new fuel cost adjustment policy from the district directors, and that this information was sufficient to permit the graders to reasonably conclude that the prior agreed practice would continue. The Jaskaniec memorandum did not inform the district directors that there would be no fuel cost adjustment clause unless one was specifically inserted in the contract. The documents show that DOT's contract began by acceptance of the contractor's bid. Thus, the contractor's understanding of the State's position on fuel cost adjustments would be crucial to determining what the State and the contractors agreed. I conclude that a reasonable interpretation of the summary judgment material would permit a conclusion that a prior agreement existed between the grading contractors and the State and that grading contracts would be subject to increased fuel cost adjustment provisions.

Having determined that the summary judgment documents could reasonably be interpreted as both the legislators and the defendants contend, the only conclusion I may draw is that summary judgment should be denied, and that a trial should be held to determine the intent of the parties to the various contracts. Intent is not an issue that can be decided on a motion for summary judgment. *Lecus v. American Mut. Ins. Co.,*

81 Wis. 2d 183, 190, 260 N.W.2d 241, 244 (1977). At trial, testimony of the district directors and others could be heard, and the trial court could assess the credibility of the witnesses to determine the intent of the parties to the contracts. Once that intent is determined, the court could consider whether the constitutional prohibition against after-the-fact contract adjustments is applicable and grant judgment accordingly.

If an examination of DOT's and the contractors' intent reveals that both intended that the fuel cost adjustment clause would be a part of all DOT grading contracts, it would be unfair not to interpret those contracts in that way. But if DOT and the contractors had differing beliefs as to the fuel cost adjustment provisions, it would be unfair for the contractors to recover their additional fuel costs because ordinary contract principles require a meeting of the minds for a contract to exist. *See Garvey v. Buhler*, 146 Wis. 2d 281, 289, 430 N.W.2d 616, 619 (Ct. App. 1988). If no meeting of the minds occurred, awarding the additional fuel costs would be after-the-fact payments prohibited by art. IV, § 26 of the Wisconsin Constitution. We will never know which scenario is correct because the majority has concluded that the contractors cannot win under any view of the facts. I cannot agree and, therefore, I respectfully dissent.